ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Parte Apelada<br><br>v.<br><br>JUAN LUIS CORNIER TORRES<br><br>Parte Apelante | KLAN202200223 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Casos Núm.:<br>JVI2019G0001<br>JLA2019G0007<br><br>Sobre:<br>Art. 93 C.P<br>Art. 5.05 L.A. |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Candelaria Rosa y el Juez Monge Gómez[1].

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 14 de mayo de 2024.

Compareció ante este Tribunal la parte apelante, el Sr. Juan Luis Cornier Torres (en adelante, el "señor Cornier Torres" o el "Apelante"), mediante recurso de apelación presentado el 23 de marzo de 2022. Nos solicitó la revocación de dos *Sentencias* emitidas y notificadas por el Tribunal de Primera Instancia, Región Judicial de Ponce (en adelante, el "TPI"), el 25 de febrero de 2022. Mediante dichos dictámenes, se encontró culpable al Apelante por violar el Artículo 93 del Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5142, y el Artículo 5.05 de la derogada Ley Núm. 404-2000, según enmendada, conocida como la "Ley de Armas de Puerto Rico, 25 LPRA sec. 458d (en adelante, "Ley de Armas").

Por los fundamentos que expondremos a continuación se *confirman* las *Sentencias* apeladas.

**I.**

Por hechos acontecidos el 17 de diciembre de 2018, el Ministerio Público presentó el 10 de enero de 2019 varias denuncias en contra del señor Cornier Torres por infringir los Artículos 93 y 285 del Código Penal

---

[1] Mediante Orden Administrativa OATA-2023-001, se designó al Hon. José Johel Monge Gómez en sustitución del Hon. Roberto Rodríguez Casillas, para entender en los méritos el recurso de epígrafe y mediante OATA-2023-036, se modificó la composición del Panel, debido a que la Hon. Gina R. Méndez Miró dejó de ejercer funciones como Jueza del Tribunal de Apelaciones.

de Puerto Rico y el Artículo 5.05 de la Ley de Armas, *supra*, que tipifican los delitos de asesinato en primer grado, destrucción de pruebas y portación y uso de armas blancas, respectivamente. 33 LPRA sec. 5142 y 5378 y 25 LPRA sec. 458d, respectivamente. En síntesis, al Apelante se le imputó dar muerte a la joven Valerie Ann Almodóvar Ojeda (en adelante, "Almodóvar Ojeda") utilizando un arma blanca punzante y cortante. Ese mismo día, se determinó causa probable para su arresto por los delitos previamente mencionados. Así las cosas, el Ministerio Público presentó los correspondientes pliegos acusatorios. En específico, la acusación del caso núm. JVI2019G0001 lee como sigue:

> EL REFERIDO ACUSADO, JUAN LUIS CORNIER TORRES C/P "MANWE UNO", ALL[Á] PARA EL D[Í]A 17 DE DICIEMBRE DE 2018, EN HORAS DE LA TARDE, EN PONCE, PUERTO RICO, QUE FORMA PARTE DE LA JURISDICCI[Ó]N DEL TRIBUNAL DE PRIMERA INSTANCIA DE PUERTO RICO, SALA DE PONCE, A PROP[Ó]SITO DIO MUERTE AL SER HUMANO VALERIE ANN ALMODOVAR OJEDA CONSISTENTE EN QUE UTILIZANDO UN ARMA BLANCA EL IMPUTADO LE INFLINGI[Ó] VARIAS HERIDAS CORTANTES EN DIFERENTES PARTES DEL CUERPO QUE LE OCASIONARON LA MUERTE.

> […]

Por su parte, la acusación del caso núm. JFJ2019G000 indicaba lo siguiente:

> EL REFERIDO ACUSADO JUAN LUIS CORNIER TORRES C/P "MANWE UNO" ALL[Á] PARA EL D[Í]A 17 DE DICIEMBRE EN HORAS DE LA TARDE, EN PONCE, PUERTO RICO, QUE FORMA PARTE DE LA JURISDICCIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA DE PUERTO RICO, SALA DE PONCE, A PROP[Ó]SITO, CONOCIENDO QUE LAS PRUEBAS Y OBJETOS POD[Í]AN PRESENTARSE EN UNA INVESTIGACI[Ó]N Y PROCEDIMIENTO JUDICIAL, DESTRUY[Ó] Y ESCONDI[Ó] PRUEBA RELACIONADA AL DELITO DE ASESINATO CON EL PROP[Ó]SITO DE IMPEDIR SU PRESENTACIÓN EN EL TRIBUNAL, **CONSISTENTE EN QUE LUEGO DE DAR MUERTE A VALERIE ANN ALMODÓVAR OJEDA**, UTILIZÓ BOLSAS NEGRAS Y TAPE TRANSPARENTE PARA ENVOLVER SU CUERPO EL CUAL COLOCÓ EN EL BAÚL DE LA GUAGUA NISSAN PATHFINDER, TABLILLA EFH-877, PERTENECIENTE A LA MADRE DE LA OCCISA, Y LUEGO LA TRANSPORTÓ HASTA EL PUEBLO DE ADJUNTAS DONDE LANZÓ SU CUERPO A LA ORILLA DE LA CARRETERA 518, KM. 3.6 EN EL BARRIO LAGO GARZAS. (énfasis suplido).

En cuanto al caso núm. JLA2019G007, la acusación dispone lo siguiente:

EL REFERIDO ACUSADO, JUAN LUIS CORNIER TORRES, C/P "MANWE UNO", ALL[Á] PARA EL D [Í]A 17 DE DICIEMBRE DE 2018, EN HORAS DE LA TARDE, EN PONCE, PUERTO RICO, QUE FORMA PARTE DE LA JURISDICCI[Ó]N DEL TRIBUNAL DE PRIMERA INSTANCIA DE PUERTO RICO, SALA DE PONCE, ILEGAL, VOLUNTARIA, MALICIOSA Y CRIMINALMENTE, SIN MOTIVO JUSTIFICADO UTILIZ[Ó] UN ARMA BLANCA PUNZANTE Y CORTANTE CONTRA VALERIA ANN ALMODOVAR OJEDA EN LA COMISIÓN DEL DELITO DE ASESINATO EN PRIMER GRADO (ART. 93 CP) SIN SER OCASIÓN DE USO COMO INSTRUMENO PROPIO DE UN ARTE, DEPORTE, PROFESION, OCUPACION U OFICIO, NI POR CONDICION DE SALUD, INCAPACIDAD O INDEFENSI[Ó]N. CONSISTETE EN QUE UTILIZ[Ó] UN ARMA BLANCA PUNZANTE Y CORTANTE PARA INFLIGIRLE VARIAS HERIDAS EN DIFERENTES PARTES DEL CUERPO A VALERIE ANN ALMODÓVAR OJEDA SIN SER UN CASO DE LEGÍTIMA DEFENSA QUE LE OCASIONARON LA MUERTE.

Posteriormente, el 28 de enero de 2020, el señor Cornier Torres presentó una "**Moción Solicitando Remedio al Amparo de la Regla 64 de Procedimiento Criminal o de Enmienda a la acusación**" mediante la cual alegó que el pliego acusatorio correspondiente al delito de destrucción de pruebas contenía una indebida acumulación de delitos. Planteó que la expresión "consistente en que luego de dar muerte a Valerie Ann Almodóvar Ojeda" sugería que el delito de asesinato en primer grado estaba incluido en la Acusación del delito de destrucción de pruebas. El 29 de enero de 2020, el TPI declaró "No Ha lugar" dicha solicitud.

El 4 de marzo de 2020, el Apelante, a través de su representación legal, manifestó su intención de formular una alegación de culpabilidad respecto al delito de destrucción de prueba. No obstante, solicitó que el lenguaje de la referida acusación fuera modificado, ya que estaba dispuesto a admitir que dispuso del cadáver mas no de haber cometido el delito de asesinato. Posteriormente, el 26 de enero de 2021 un panel hermano de este Tribunal, en el caso núm. KLCE202001127, ordenó la eliminación de la aludida frase por entender que su inclusión implicaba dar por hecho que el Apelante fue el responsable de la muerte de Almodóvar Ojeda, sin haberse celebrado un juicio para probar tal hecho. Más adelante, el Ministerio Público solicitó el archivo del caso núm. JFJ2019G000, correspondiente al delito de destrucción de pruebas.

Luego de un extenso trámite procesal impertinente a las controversias que nos ocupan, el juicio en su fondo se celebró por tribunal de derecho los días 28, 29, y 30 de junio de 2021,1, 2 y 9 de julio de 2021, 19, 20, 21 y 22 de octubre de 2021, 3 de noviembre de 2021 y el 6 de diciembre de 2021. Una vez finalizado el desfile de prueba, el 25 de febrero de 2022, el TPI emitió dos *Sentencias* mediante las cuales condenó al señor Cornier Torres a una pena de noventa y nueve (99) años por infringir el Artículo 93 del Código Penal de Puerto Rico*, supra,* y a una pena de cuatro (4) años por infringir el Artículo 5.05 de la Ley de Armas, *supra*, la cual fue duplicada conforme al Artículo 7.03 de dicho estatuto, sumando un total de ocho (8) años. 25 LPRA sec. 460b. Dichas penas están siendo cumplidas consecutivamente.

Inconforme con lo anteriormente resuelto, el Apelante acudió a este Tribunal mediante el recurso de epígrafe, en el que señaló los siguientes errores:

1. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL PERMITIR EN AMBOS CASOS, PESE A LA OBJECIÓN DE LA DEFENSA, QUE EL MINISTERIO P[Ú]BLICO INCUMPLIERA CON EL REQUISITO DE NOTIFICACIÓN DE PRUEBA AL AMPARO DE LA REGLA 404B DE EVIDENCIA Y EN SU CONSECUENCIA ADMITIR Y CONSIDERAR PRUEBA TESTIFICAL, DOCUMENTAL Y DEMOSTRATIVA DE FORMA SUSTANTIVA Y CORROBORATIVA, SOBRE CONDUCTA ESPECÍFICA, LA COMISIÓN DE OTROS DELITOS, U OTROS ACTOS ESPECÍFICOS, Y EN RELACIÓN CON ASUNTOS NO ESPECIFICADOS EN LAS ACUSACIONES, EN VIOLACIÓN A DICHA REGLA Y AL DEBIDO PROCESO DE LEY.

2. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA EN SU APRECIACIÓN DE LA PRUEBA AL DECLARAR CULPABLE, AUN CUANDO EL MINISTERIO P[Ú]BLICO NO PROBÓ LOS CASOS MÁS ALLÁ DE DUDA RAZONABLE.

3. ERRÓ [E]L TRIBUNAL DE PRIMERA INSTANCIA EN SU APRECIACIÓN DE LA PRUEBA AL DECLARAR CULPABLE AL ACUSADO, AUN CUANDO EL MINISTERIO P[Ú]BLICO NO PROBÓ LOS CASOS MÁS ALLÁ DE DUDA RAZONABLE, Y MÁXIME EN ESTE CASO CUANDO POR DISPOSICI[Ó]N REGLAMENTARIA DEBIÓ EVALUAR CON SOSPECHA LOS TESTIMONIOS DE LOS DOS TESTIGOS DE HECHOS, POR TRATARSE DE COAUTORES, DECLARARON BAJO ACUERDO CON EL MINISTERIO PÚBLICO MEDIANTE EL CUAL LES ARCHIVARON SUS CASOS A CAMBIO DE DECLARAR.

Tras un largo trámite procesal conducente al perfeccionamiento del recurso de autos, que incluyó la transcripción de la prueba oral de oficio por parte de la Secretaría de este Tribunal, el 8 de mayo de 2024, el Pueblo de Puerto Rico, por conducto de la Oficina del Procurador General, presentó su alegato en oposición al recurso.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

El Código Penal de Puerto Rico fue promulgado como una medida para prevenir, regular y disminuir la frecuencia de conductas delictivas como el delito de asesinato. Así, el Artículo 92 de dicha legislación define el referido delito como la acción u omisión de dar muerte a un ser humano ya sea a propósito, con conocimiento o temerariamente. 33 LPRA sec. 5141. Es menester destacar que la Ley Núm. 246-2014 reemplazó la palabra "premeditación" en el delito de asesinato por las palabras a "propósito" o "con conocimiento". D. Nevares-Muñiz, *Código Penal de Puerto Rico Comentado por Dora Nevares Muñiz*, cuarta ed. rev., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 153. En la tipificación del delito de asesinato se engloban todas aquellas modalidades en las que exista la intención de matar. Pueblo v. Roche, 195 DPR 791, 797 (2016). Es decir, el término intención es sinónimo de actuar a propósito, con conocimiento o temerariamente. 33 LPRA sec. 5014 (z.1).

Una persona actúa a propósito con relación a un resultado o circunstancia cuando su objetivo consciente es la producción de dicho resultado o cuando cree que la circunstancia existe. 33 LPRA sec. 5035. Ésta actúa con conocimiento cuando está consciente de que la producción del resultado o la existencia de la circunstancia es prácticamente segura. Íd. En cambio, actúa temerariamente cuando está consciente de que su conducta genera un riesgo sustancial e injustificado de que se produzca el resultado prohibido por ley. Íd.

El elemento subjetivo de la conducta delictiva constituye una cuestión de hechos a ser evaluada por el juez o el jurado, según sea el caso. D. Nevares-Muñiz, *Derecho Penal Puertorriqueño*, séptima ed. rev. San Juan, Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 193. Este "**se manifiesta por las circunstancias relacionadas con el hecho, la capacidad mental, las manifestaciones y conducta de la persona**". 33 LPRA sec. 5034 (énfasis suplido). Esto es, la intención se presume por la forma en que se lleva a cabo la acción ilegal con el designio de perjudicar a otro. Pueblo v. Negrón Ayala, 171 DPR 406, 420 (2007). En la mayoría de los casos, la intención específica de matar solo puede ser determinada mediante una inferencia razonable de los hechos. Pueblo v. Rodríguez Pagan, 182 DPR 239, 250 (2011). Así pues, para probar los elementos subjetivos del delito es necesario analizar los acontecimientos previos, simultáneos y posteriores al crimen. Pueblo v. Rosario, 160 DPR 592, 611 (2003). Esto se debe a que, **a través de las circunstancias** retrospectivas, concomitantes y **prospectivas podemos determinar si la persona actuó a propósito**, con conocimiento o temerariamente. Nevares-Muñiz, *op. cit.*, pág. 193.

Nuestro sistema legal divide el delito de asesinato en dos grados, según la perversidad demostrada por el acusado al cometer el acto y con el único objetivo de determinar la pena a imponer. Pueblo v. Negrón Ayala, *supra*, pág. 418. Cónsono con lo anterior, el Artículo 93 del Código Penal detalla las modalidades que constituyen asesinato en primer grado y las que se clasifican como segundo grado. 33 LPRA sec. 5142. En lo aquí pertinente, **se considera asesinato en primer grado aquel** "**perpetrado** por medio de veneno, acecho, tortura o **a propósito** o con conocimiento." Íd. (énfasis suplido). Esta modalidad tomó el lugar de la modalidad de asesinato deliberado del Código Penal del 1902 y 1974 y premeditado del Código del 2004. Nevares-Muñiz, *op. cit.*, pág. 155.

**B.**

El Artículo 5.05 de la derogada Ley de Armas, *supra*, regulaba la portación y uso de armas blancas. 25 LPRA sec. 458d. En lo que aquí

concierne, el aludido Artículo disponía que toda persona que sin motivo justificado utilizara contra otra un **cuchillo** o cualquier otro instrumento similar que se considere como un arma blanca incurre en delito grave y será sancionada con pena de reclusión por un término fijo de tres (3) años. Íd. (énfasis suplido). En caso de que mediaran circunstancias agravantes, la pena podía ser aumentada hasta un máximo de seis (6) años. Íd. Entre las circunstancias agravantes se encuentran las siguientes, a saber: (1) el convicto tiene historial delictivo que no se consideró para imputar reincidencia, (2) el convicto cometió el delito mientras disfrutaba de los beneficios de sentencia suspendida, libertad bajo palabra, restricción domiciliaria, libertad provisional bajo fianza o en un programa de desvío o (3) el convicto causó grave daño corporal a la víctima o empleó amenaza de causárselo. 33 LPRA sec. 5099. Por su parte, el Artículo 7.03 de la entonces vigente Ley de Armas, *supra*, establecía que cuando una persona utilizara un arma en la comisión de cualquier delito y como resultado de tal violación otra persona sufría un daño físico o mental, la pena establecida debía duplicarse. 25 LPRA sec. 460b.

## C.

Existe un fuerte interés en demostrar con evidencia los hechos señalados en una acusación, centrándose en esos eventos específicos en lugar de abordar otra conducta de las partes distinta a la conducta imputada. E.L. Chiesa Aponte*, Reglas de Evidencia Comentadas*, San Juan, Eds. Situm, 2016, pág. 95. De conformidad con ello, por vía de la Regla 404(b) de las de Evidencia nuestro ordenamiento reconoce una regla de exclusión de lo que constituye conducta indebida distinta a la imputada, cuando se presenta con el propósito de inferir la tendencia a involucrarse en este tipo de comportamiento y, por consiguiente, deducir que el acusado incurrió en la conducta imputada. 32 LPRA Ap. V, R. 404(b); Pueblo v. Serrano Morales, 201 DPR 454, 461 (2018) (citando a E.L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, San Juan, Eds. Situm, 2016, pág. 96). En detalle, la referida Regla establece lo siguiente:

> **Evidencia de conducta específica, incluyendo la comisión de otros delitos**, daño civil u otros actos, **no es admisible para probar la propensión a incurrir en ese tipo de conducta** y con el propósito de inferir que se actuó de conformidad con tal propensión. 32 LPRA Ap. V, R. 404 (b). (énfasis suplido).

Conforme a esta norma, en casos criminales no se considera admisible como prueba de cargo aquella evidencia de otros delitos cometidos por el acusado, distintos al imputado. Chiesa Aponte, *op. cit.*, pág. 96.  La regla de exclusión sólo se activa cuando el proponente invita al juzgador de los hechos a inferir conducta imputada a base de propensión. Íd., pág. 574. Su objetivo es prevenir la adjudicación de controversias a base de la pasada mala conducta de las partes. Íd., pág. 96. De igual manera, pretende evitar que el acusado sea condenado por **delitos anteriores**, a pesar de que la prueba del Estado sobre el delito imputado sea insuficiente. E.L. Chiesa Aponte, *Compendio de Evidencia,* Mexico, Tirant lo Blanch, 2021, pág. 574. Así pues, el fin ulterior de dicha norma procesal radica en excluir "lo que constituye mala conducta distinta a la imputada (*uncharged misconduct*), cuando se presenta con el objetivo de inferir propensión a incurrir en este tipo de conducta y, por ende, inferir que el actor incurrió en la conducta imputada". Pueblo v. Serrano Morales, *supra*, pág. 461.

La aludida Regla se respalda con la opinión generalizada de que este tipo de prueba conlleva varios riesgos. Pueblo v. Martínez Solís, 128 DPR 135, 151 (1991). Estos peligros son: (1) que se le adscriba un peso mayor del que realmente merece, (2) que desvíe la atención de los elementos centrales del caso o (3) que alargue de manera innecesaria el proceso. Íd. Sin embargo, **evidencia de dicha conducta es admisible si es pertinente para otros propósitos, tales como prueba de motivo, oportunidad, intención, preparación, conocimiento, plan, identidad, ausencia de error o accidente o para establecer o refutar una defensa**. 32 LPRA Ap. V, R. 404(b). Así, la admisión de prueba de conducta específica o de la comisión de otros delitos depende de tres criterios, a saber: (1) el propósito por la cual se presenta, (2) la modalidad bajo la cual se ofrece y (3) el tipo de procedimiento. Pueblo v. Martínez Solís, *supra*,

pág. 151. En virtud de ello, si la persona acusada lo requiere, el Ministerio Público debe informarle sobre la naturaleza general de cualquier prueba que tenga intención de presentar bajo el inciso (b) de la Regla 404 de Evidencia, *supra*.

**D.**

Es norma sólidamente establecida en nuestra jurisdicción que no se favorece la intervención de los tribunales apelativos al momento de revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formulados por el Tribunal de Primera Instancia en ausencia de pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Negrón Ramírez, 213 DPR ___ (2024), 2024 TSPR 41; Pueblo v. Hernández Doble, 210 DPR 850, 864 (2022). Por tal razón, se les concede gran deferencia a las determinaciones de hechos realizadas por los juzgadores de instancia, así como a las adjudicaciones de credibilidad que estos hacen sobre los testigos que declaran ante ellos. Pueblo v. Negrón Ramírez, *supra*, pág. 18. Esto responde al hecho de que son el Juez y el Jurado los que están en mejor posición para aquilatar la prueba testifical al tener la oportunidad de oír, ver y apreciar el comportamiento de los testigos. Íd., pág. 16; Pueblo v. Hernández Doble, *supra,* pág. 864. Esto adquiere mayor relevancia cuando se trata de la prueba oral desfilada en el juicio. Pueblo v. Negrón Ramírez, *supra*, págs. 16-17. Además, "[e]l veredicto del Jurado, como la sentencia del [J]uez, es un acto investido con la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia". Pueblo v. Figueroa Rosa, 112 DPR 154, 159 (1992).

Ahora bien, se ha reconocido que a pesar de la deferencia que merece la determinación apelada, la misma podría ser revocada si: (1) se demuestra que hubo pasión, prejuicio o parcialidad y/o si se incurre en error manifiesto o (2) si la prueba no concuerda con la realidad fáctica, es increíble o imposible. Pueblo v. Santiago, 176 DPR 133, 148 (2009). Es decir, los tribunales apelativos tienen la potestad de sustituir el criterio de los tribunales de instancia en aquellas ocasiones en que, "a la luz de la

prueba admitida, no exista base suficiente que apoye su determinación". Pueblo v. Hernández Doble, *supra*, pág. 865.

Nuestro más alto foro ha definido pasión, perjuicio o parcialidad como "aquellas inclinaciones personales de tal intensidad que llevan a un juzgador a actuar movido por éstas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre las mismas y sin importar la prueba que se haya presentado en el juicio". Pueblo v. Negrón Ramírez, *supra*, pág. 19. Por otro lado, han expresado que "las conclusiones del tribunal se considerarán claramente erróneas si un análisis de la totalidad de la evidencia recibida revela que las conclusiones están en conflicto con el balance más racional, justiciero y jurídico". Pueblo v. Hernández Doble, *supra*, pág. 865.

**E.**

En nuestro ordenamiento jurídico, la presunción de inocencia representa uno de los derechos más significativos y fundamentales para quienes enfrentan acusaciones criminales. Esta presunción se encuentra consagrada en el Artículo II, Sección 11 de la Constitución de Puerto Rico, la cual dispone que, en todos los procesos criminales, "el acusado disfrutará del derecho a gozar de la presunción de inocencia". Const. PR, Art. II, Sec. 11, 1 LPRA. En sintonía con ello, nuestras Reglas de Procedimiento Criminal establecen que en cualquier proceso criminal se considerará inocente al acusado hasta que demuestre lo contrario y si hay dudas razonables sobre su culpabilidad, será absuelto. 34 LPRA Ap. II, R. 110. Así pues, la presunción de inocencia es un componente esencial del debido proceso de ley. Pueblo v. Irizarry, 156 DPR 780, 786 (2002).

Dada la robustez de la presunción de inocencia, el acusado puede confiar en ella sin la necesidad de proporcionar pruebas para su defensa. Íd., pág. 787. Esto es, le corresponde al Estado presentar evidencia y cumplir con la carga probatoria para demostrar, más allá de duda razonable, todos los elementos del delito, la intención criminal y la vinculación de la persona acusada con los hechos. Pueblo v. Negrón Ramírez, s*upra*, págs. 12-13; Pueblo v. Santiago *et al.*, 176 DPR 133, 142

(2009). Además, no solo es necesario que el Estado presente pruebas relacionadas con los elementos del delito imputado, sino que éstas deben ser suficientes y satisfactorias. Pueblo v. Negrón Ramírez, *supra*, pág. 13; Pueblo v. Irizarry, *supra*, pág. 787. Es decir, deben producir "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". Pueblo v. Negrón Ramírez, *supra*, pág. 13. Por ende, la falta de evidencia sobre alguno de los elementos del delito significaría que el Estado no ha cumplido con su carga probatoria, lo que resultaría en la absolución del acusado en relación con el delito que se le imputa. Íd.

No obstante, para rebatir esta presunción no es necesario alcanzar certeza matemática, sino que basta la certeza moral obtenida mediante un análisis racional. Pueblo v. Rosario Reyes, 138 DPR 591, 598 (1995). En otras palabras, no es necesario eliminar toda duda posible sino vencer todas las dudas basadas en el razonamiento de todos los elementos de juicio envueltos en el caso, evitando las que sean meramente especulativas o imaginarias. Pueblo v. Negrón Ramírez, *supra*, pág. 13. Finalmente, la duda razonable que acarrea la absolución es aquella que se produce de una consideración justa, imparcial y serena de la totalidad de la evidencia del caso. Pueblo v. García Colón I, 182 DPR 129, 175 (2011). De manera que, la duda realmente justificada se reduce a la insatisfacción o inquietud de la conciencia del juzgador con la prueba provista. Pueblo v. Irizarry, *supra*, pág. 788.

**F.**

La Regla 110 de las Reglas de Evidencia establece los principios que el juzgador de los hechos debe considerar al valorar la prueba presentada. Esta norma habilita el uso de evidencia indirecta o circunstancial para demostrar los hechos de un caso. En específico, la referida Regla dispone en su parte pertinente que:

> (H) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o **mediante evidencia indirecta o circunstancial**. Evidencia directa es aquélla que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es **aquélla que tiende a demostrar**

**el hecho en controversia probando otro distinto, del cual por si o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia**. 32 LPRA Ap. VI, R. 110 (énfasis suplido).

En virtud de lo anterior, cualquier acontecimiento en controversia puede ser probado utilizando evidencia directa o circunstancial. La evidencia directa es aquella que, de ser creída por el juzgador, establece el hecho a ser probado sin necesidad de consideración adicional. Chiesa Aponte, *op. cit.*, pág. 53. Por su parte, la evidencia circunstancial o indirecta es aquella que busca demostrar el hecho en controversia mediante la prueba de otro hecho diferente, del cual, en conjunto con otros hechos previamente establecidos, se puede razonablemente deducir el hecho en cuestión o alcanzar una conclusión definitiva respecto a los hechos probados en el caso. Colón y otros v. K-mart y otros, 154 DPR 510, 522 (2001).

La característica fundamental de la prueba circunstancial es que, aunque pueda ser creída, por sí sola no es suficiente para probar el hecho en controversia, pues se requiere un proceso de inferencias en conjunción con otra evidencia ya admitida o por admitirse o un razonamiento basado en la experiencia. Admor. F.S.E. v. Almacen Ramón Rosa, 151 DPR 711, 719 (2000). Al considerar la evidencia circunstancial aducida para probar un hecho, el juzgador debe discernir entre lo que es una mera conjetura y lo que constituye una inferencia razonable. Íd., págs. 719-720. Al hacer esta distinción, se garantiza una evaluación justa y acertada de la evidencia circunstancial. Así, procede que se considere un hecho como probado mediante una inferencia cuando existe una relación lógica entre esta inferencia y el hecho ya establecido. Chevere Mourino v. Levis Goldstein, 152 DPR 492, 500 (2000).

En consonancia con lo anterior, nuestro máximo foro judicial ha expresado que la prueba circunstancial es tan suficiente como la prueba directa para evidenciar cualquier hecho, dado que son intrínsecamente equivalentes. Pueblo v. Picó Vidal, 99 DPR 708, 713 (1971); Pueblo v. Salgado Velázquez, 93 DPR 380, 383 (1966). Tal reconocimiento fortalece la posición de la evidencia indirecta como un elemento crucial en el

descubrimiento de la verdad. En este sentido, se prefiere una evidencia circunstancial contundente que una evidencia directa poco fiable. Chiesa Aponte, *op. cit.,* pág. 53.

**G.**

En los casos criminales, la confiabilidad de los testimonios desempeña un papel fundamental en la emisión de los fallos condenatorios. Cuando el foro primario le otorga credibilidad a un testigo, ese testimonio, por sí solo, puede ser suficiente en derecho para sustentar un fallo de culpabilidad, incluso si no ha sido perfecto. Pueblo v. Chévere Heredia, 139 DPR 1,15 (1995). Cuando un testimonio incluye aspectos que no son considerados aceptables, es al juzgador de los hechos a quien le corresponde dirimir la credibilidad del testigo que lo ofreció. Íd., págs. 15-16. Asimismo, la única consecuencia de que un testigo contradiga su propio testimonio es que se ponga en entredicho su confiabilidad. Pueblo v. Cruz Negrón, 104 DPR 881, 883 (1976). Por esta razón, le corresponde al juez de instancia, establecer el valor probatorio del resto del testimonio. Íd.

Siguiendo esta misma línea, la Regla 156 de Procedimiento Criminal regula lo concerniente a los testimonios de los coautores. En específico, indica lo siguiente:

> El testimonio de un coautor o del cooperador será examinado con desconfianza y se le dará el peso que estime el juez o el jurado luego de examinarlo con cautela a la luz de toda la evidencia presentada en el caso. 34 LPRA Ap. II, R. 156.

[…]

En otras palabras, el testimonio de un coautor de un delito será examinado con escepticismo y se le otorgará la importancia que el juez de instancia considere adecuada después de analizarlo detenidamente. No obstante, es norma establecida en nuestro sistema legal que, aunque este tipo de testimonio deba examinarse con desconfianza, esto no impedirá que, si se considera creíble más allá de una duda razonable, sea suficiente para sustentar la convicción del acusado. Pueblo v. Echevarría Rodríguez I, 128 DPR 299, 318 (1991). Cabe destacar que no se requiere la presentación de evidencia corroborativa de dicho testimonio. Íd., pág. 317.

Por último, **la referida Regla tiene como único propósito orientar al juzgador de los hechos respecto al valor que debe asignarse a un testimonio sin necesidad de descartarlo**. Íd., pág. 318.

**III.**

En el presente caso, el Apelante nos solicita que revoquemos las *Sentencias* del TPI mediante las cuales fue declarado culpable por los delitos de asesinato en primer grado y portación y uso de un arma blanca.

Como primer señalamiento de error, el señor Cornier Torres plantea que el foro primario erró al permitir que el Ministerio Público incumpliera con el requisito de notificación de prueba, al amparo de la Regla 404 (b) de las Reglas de Evidencia, *supra*, y admitir prueba testifical, documental y demostrativa sobre conducta específica y la comisión de otros delitos.

Por su parte, el Pueblo de Puerto Rico sostiene que la conducta a la cual alude el señor Cornier Torres en su recurso es intrínseca a los hechos imputados y no está cobijada por la aludida Regla de Evidencia. Veamos.

Surge del expediente ante nuestra consideración que, tras el asesinato de la joven Almodóvar Ojeda, el Ministerio Público presentó varias denuncias en contra del Apelante por infringir los Artículos 93 y 285 del Código Penal y el Artículo 5.05 de la Ley de Armas, *supra*, que tipifican los delitos de asesinato en primer grado, destrucción de pruebas y portación y uso de armas blancas. Posteriormente, el Ministerio Público decidió archivar el cargo correspondiente al delito de destrucción de pruebas. Entre las personas que declararon en el juicio se encuentran los coautores del delito de destrucción de pruebas, a saber: el Sr. Carlos Pacheco Santiago (en adelante, el "señor Pacheco Santiago" o "Amarillo") y la Sra. Loraine Bonet Torres (en adelante, la "señora Bonet Torres"). Conforme hemos adelantado, el 25 de febrero de 2022, el foro primario condenó al señor Cornier Torres a una pena de noventa y nueve (99) años por infracción al Artículo 293 del Código Penal, que tipifica el delito de asesinato en primer grado, y a una pena de ocho (8) años por el delito de portación y uso de armas blancas, tipificado en el Artículo 5.05 de la Ley de Armas, *supra*.

Como parte de sus planteamientos, el Apelante alude a las más de novecientas (900) piezas de evidencia admitidas y a los testimonios que fueron presentados por el Ministerio Público. A pesar de que el Apelante hizo alusión a la admisión de prueba documental, testifical y demostrativa, no especifica a cuáles se refiere, por lo que –en principio– no nos puso en condiciones para comprender el efecto que tuvo la admisión de dicha evidencia y su relación con sus planteamientos de derecho. Simplemente, se limitó a indicar –en términos generales– que se trataba de toda la evidencia presentada que estuvo relacionada con los eventos a partir del "levantamiento del cadáver del hogar". No olvidemos que, en cuanto al contenido del alegato de un apelante en un caso criminal, la Regla 28 de nuestro Reglamento requiere que del cuerpo del escrito se desprendan los señalamientos breves y concisos de los errores que a juicio de la parte apelante cometió el Tribunal de Primera Instancia y una discusión de los errores señalados, incluyendo las disposiciones de ley y la jurisprudencia aplicable. 4 LPRA Ap. XXII-B, RR. 28(C) (d) y (e).

Lo anterior, debido a que los errores no discutidos en un recurso se entienden renunciados y no serán considerados por los tribunales revisores. Pueblo v. Miró González, 133 DPR 839, 857 (1993). Así se ha pautado jurisprudencialmente que:

> La exigencia de que el escrito de apelación contenga un señalamiento de error y una discusión del mismo no es un mero preciosismo inconsecuente. Es en la discusión del error donde se enmarca la actuación alegadamente errónea del foro primario cuya revocación se ha solicitado, a la luz de los hechos y del derecho aplicable. Es lo que se ha denominado "el corazón" de la apelación o "la artillería pesada". No podemos olvidar que el derecho, particularmente el derecho o práctica apelativa, es rogado. Morán v. Martí, 165 DPR 356, 369 (2005).

Así pues, es evidente que en materia de derecho apelativo las partes no deben menospreciar la exigencia de que los señalamientos de error en una apelación sean discutidos de manera apropiada y con referencia a los hechos en los que basa los asuntos de derecho que solicita la intervención de los foros apelativos, pues el resultado de ello es que se puedan entender por renunciados al tiempo que se limita nuestra labor revisora.

No obstante lo anterior, y haciendo abstracción de dicha realidad, el Apelante apunta a que el TPI incidió al admitir prueba de conducta específica sin que el Ministerio Público cumpliera con el requisito de notificación de la Regla 404 (b) de las Reglas de Evidencia, *supra*. Sin embargo, debemos mencionar que el Apelante no incluyó cómo dicha evidencia fue el factor decisivo o sustancial en las *Sentencias* que recayeron en su contra, de conformidad con la Regla 105 de las de Evidencia, 32 LPRA Ap. VI, R. 105. Tampoco se alegó o argumentó, como lo requiere la aludida disposición reglamentaria, que dicha admisión constituyó una violación a un derecho constitucional del señor Cornier Torres. Vemos, pues, que el Apelante incumplió con su deber de ponernos en condiciones de revertir los dictámenes apelados, por haberse cometido un error en la admisión de la evidencia sobre los hechos relacionados con la disposición del cuerpo de la víctima. Tampoco del expediente se desprende la comisión de un error extraordinario que amerite nuestra intervención. El Apelante se limitó a argumentar sus planteamientos a la luz de la norma procesal de exclusión dispuesta en la Regla 404 (b) de Evidencia, *supra*. Ahora bien, como elaboraremos a continuación, sostenemos que en el presente caso no concurren los requisitos establecidos en la referida Regla que justifiquen nuestra intervención con los dictámenes apelados. Nos explicamos.

Tal y como hemos adelantado, la Regla 404 (b) de Evidencia, *supra*, incorpora una pauta normativa de exclusión que prohíbe la presentación de conducta indebida distinta a la imputada, cuando se utiliza con el propósito de insinuar que el acusado cometió la conducta alegada. Pueblo v. Serrano Morales, *supra*, pág. 461. Así pues, no es admisible evidencia de conducta específica, como la comisión de otros delitos, para probar la propensión a incurrir en ese tipo de conducta. 32 LPRA Ap. V, R. 404(B). **El propósito de esta Regla es impedir que el acusado sea sentenciado por sus acciones pasadas.** Chiesa Aponte, *op. cit.*, pág. 574. Sin embargo, la evidencia de esa conducta puede ser admitida si es relevante para otros propósitos como demostrar motivo, oportunidad, intención, preparación,

conocimiento, plan, identidad, ausencia de error o accidente o para establecer o refutar una defensa. 32 LPRA Ap. V, R. 404(B). Por último, si el acusado lo solicita, el Ministerio Público debe informar su intención de presentar pruebas en virtud de esta Regla. Íd.

Por otro lado, el delito de asesinato se configura cuando se da muerte a un ser humano ya sea a propósito, con conocimiento o temerariamente. 33 LPRA sec. 5141. Se considera asesinato en primer grado aquel "perpetrado por medio de veneno, acecho, tortura o **a propósito** o con conocimiento". 33 LPRA sec. 5142 (énfasis suplido). Es menester destacar que mediante la aprobación del Código Penal de 2012 se sustituyó el elemento subjetivo de "premeditación" en el delito de asesinato en primer grado por "a propósito" o "con conocimiento". Nevares-Muñiz, *op. cit.*, pág. 153. Esta modalidad tomó el lugar de la modalidad de asesinato deliberado y premeditado, según tipificados en los Códigos Penales derogados. Nevares-Muñiz, *op. cit.*, pág. 155.

Así pues, resulta de particular importancia detallar cómo se define el elemento subjetivo de "a propósito" en nuestro ordenamiento jurídico. Conforme el Código Penal de 2012, una persona actúa "a propósito" con relación a un resultado **cuando su objetivo consciente es la producción de dicho resultado**. 33 LPRA sec. 5035(1)(a). De igual manera, se entiende que se actúa "a propósito" con relación a una circunstancia cuando dicha persona cree que la circunstancia está presente. Íd., inciso (1)(b).

Es esencial resaltar que el elemento subjetivo del delito es una cuestión de hechos que el juzgador debe analizar y se manifiesta por las circunstancias relacionadas a la conducta de la persona. Nevares-Muñiz, *op. cit.*, pág. 193. Esto es, para evidenciar el componente subjetivo del delito es fundamental analizar los hechos que ocurrieron **antes, durante y después de la comisión del crimen**. Pueblo v. Rodríguez Pagán, 182 DPR 239, 250 (2011).

En su sustrato, el Apelante sostiene que la admisión de la prueba relacionada al cargo que finalmente se le archivó sobre destrucción de

pruebas para establecer los elementos de delito de asesinato en primer grado podría considerarse como acontecimientos concomitantes y posteriores, pero también estaban dentro del ámbito de la prueba de motivo, oportunidad, intención, preparación, plan y conocimiento, según lo establecido en la Regla 404(b) de Evidencia, *supra*. Argumenta que la nueva situación creada por el Ministerio Público al archivar la acusación por el delito de destrucción de pruebas, tipificado en el Artículo 285 del Código Penal, *supra*, requería que se le notificara de la utilización de la evidencia relacionada con motivo, oportunidad, intención, preparación, plan y conocimiento. Asimismo, alega que toda la evidencia presentada a partir del levantamiento del cadáver está protegida por dicha Regla. Por su parte, el Ministerio Público arguye que la referida norma de exclusión aplica a aquella conducta extrínseca a los hechos particulares del caso y, por consiguiente, evidencia sobre conducta intrínseca a los hechos imputados, no está cobijada por la Regla 404 (b) de Evidencia, *supra*.

Tras un examen minucioso de la prueba presentada y del derecho aplicable, es forzoso concluir que la Regla 404(b) de Evidencia, *supra*, se concentra en la inadmisibilidad de prueba sobre conducta específica, como delitos cometidos **con anterioridad** a los hechos que provocaron la presentación de cargos en contra de una persona particular para probar la propensión de incurrir en el tipo de conducta imputada. Como se percibe, la Regla 404 (b) de Evidencia, *supra*, es clara a los efectos de que será inadmisible toda prueba que se pretenda presentar en un pleito sobre delitos cometidos o conducta anterior a los hechos por los cuales el acusado está siendo juzgado. Ello descarta, *ipso facto*, los actos que formaron parte de la secuencia de los hechos que motivaron la acusación de dicho individuo o, como lo describe el Pueblo de Puerto Rico, de aquella conducta intrínseca a los hechos imputados. **Es decir, se hace indispensable determinar el momento en que se cometieron los delitos para activar la norma de exclusión de prueba contenida en la Regla 404 (b) de Evidencia,** *supra*. Sobre el particular, y a manera ilustrativa, en la jurisdicción federal se ha resuelto que si la conducta no

imputada que proviene de la misma serie de transacciones que el delito imputado o si es necesaria para completar la narrativa del crimen en el juicio, la evidencia de esa conducta no se considera como prueba de otros delitos sujeta a la Regla 404 (b) de las Reglas de Evidencia Federal, la cual es equivalente a la nuestra. United States v. Palacios, 677 F.3d 234, 245 (4to Cir. 2012).

Surge del expediente ante nuestra consideración que el Ministerio Público utilizó los testimonios y la evidencia relacionada con el levantamiento del cadáver de la víctima. Nótese, pues, que dicha prueba formó parte de la cadena de eventos que provocaron la radicación de cargos contra el señor Cornier Torres. No estamos ante un panorama en el que se admitió evidencia sobre un delito de destrucción de pruebas cometido con anterioridad a la radicación de los cargos contra el Apelante o sobre alguna conducta desplegada por este último con el objetivo de establecer propensión a actuar de dicha forma. En otras palabras, dichos actos no fueron efectuados antes del 17 de diciembre de 2019, día en que ocurrieron los hechos que resultaron en la presentación de cargos contra el señor Cornier Torres, sino que fue parte de la secuencia de hechos que desembocaron en la radicación de cargos y que formó parte de la narrativa pertinente del delito de asesinato o, como lo cataloga el Pueblo en su alegato en oposición, a evidencia sobre conducta intrínseca a los hechos imputados.

De la lectura del pliego acusatorio presentado por el Estado en contra del señor Cornier Torres, surge que se le imputó haberle dado muerte a Valerie Ann Almodóvar Ojeda "a propósito" mediante la utilización de un arma blanca. Así pues, de conformidad con el estado de derecho vigente, el Ministerio Público estaba en la obligación de probar los elementos de los delitos mediante prueba sobre los hechos anteriores, concomitantes y posteriores al crimen. Pueblo v. Rodríguez Pagan, *supra*, pág. 250.

En otras palabras, el peso probatorio estaba atado a la conducta desplegada por el Apelante durante los eventos que dieron paso a la

presentación de cargos en su contra. 33 LPRA sec. 5034. Por estas razones, somos de la opinión de que la evidencia relacionada con los eventos ocurridos después del levantamiento del cadáver no está sujeta a la Regla 404(b) de Evidencia, *supra*. Esto es así ya que **no** estamos ante una conducta pasada o cometida con anterioridad por parte del Apelante, sino que estamos ante actos que formaron parte de los hechos o eventos que movieron la maquinaria estatal investigativa.

Del análisis de los testimonios de los coautores, surge que los mismos sirvieron para establecer el estado mental del señor Cornier Torres y así probar el elemento subjetivo del delito de asesinato en primer grado. Nótese que la prueba que tuvo ante sí el foro *a quo* estaba dirigida a establecer el objetivo consciente del señor Cornier Torres de producir el resultado, a saber: la muerte a la víctima. 33 LPRA sec. 5035 (1)(a).

Por último, aunque el foro primario hizo referencia a los términos "deliberación" y "malicia" en su determinación, en vez de al elemento subjetivo de "a propósito", según surge del Código Penal de 2012, es norma trillada de que este foro apelativo intermedio revisa el resultado y no los fundamentos en los que el Tribunal de Primera Instancia fundamenta sus determinaciones. Al efectuar dicho análisis, de manera desapasionada y mesurada, y a la luz del estado de derecho vigente, somos de la opinión de que no se cometió el error señalado.

Aclarado este asunto, procedemos a discutir el restante de los señalamientos de error.

El segundo y tercer error están íntimamente relacionados, por lo que se discutirán en conjunto. Específicamente, el señor Cornier Torres plantea que el foro primario erró en su apreciación de la prueba al declarar culpable al acusado, aun cuando el Ministerio Público no probó los delitos más allá de duda razonable y máxime en este caso cuando debió evaluar con sospecha los testimonios de los dos testigos de hechos, por tratarse de coautores a quienes le archivaron sus casos a cambio de declarar. No le asiste la razón. Veamos por qué.

Para facilitar la comprensión de nuestro análisis, procedemos a resumir la prueba testifical que tuvo ante sí el foro sentenciador.

**Zaida Ojeda Pérez**

La Sra. Zaida Ojeda Pérez (en adelante, la "señora Ojeda Pérez") es la madre de la joven Almodóvar Ojeda. Ésta testificó que reside en el Municipio de San Germán y que se dedicaba a brindar servicios de "catering". Declaró que Almodóvar Ojeda era estudiante de comunicaciones en la Universidad Católica de Mayagüez y que se graduó de chef en la Escuela Hotelera de Mayagüez. Expresó que, al momento de los hechos del caso, su hija residía en Quintas de Monserrate en el Municipio de Ponce con su novio, el Sr. Osvaldo Andrés Antomattei Pasavento (en adelante, el "señor Atomattei Pasavento"). Relató que éstos mantuvieron una relación por el lapso de tres (3) años.[2] Mencionó que no conocía al señor Cornier Torres.[3] Expresó que la última vez que vio a su hija fue el 16 de diciembre de 2018 porque ésta se había quedado en su casa de jueves a domingo y que el jueves y el sábado brindó servicios de mozo para los "catering".[4] De igual manera, manifestó que su hija tenía una actividad el domingo en el Museo de Ponce a las 2:00 p.m. Mencionó que su hija utilizaba su vehículo, el cual era una guagua Pathfinder color marrón del año 2001.[5] Expresó que su hija le dijo que tenía que buscar a su novio porque él tuvo una actividad el sábado y se le quedó su vehículo en el Municipio de Yauco.[6] Declaró que el lunes, 17 de diciembre de 2018, Almodóvar Ojeda fue a la Universidad Católica de Mayagüez a tomar un examen de inglés y que le comunicó a eso de las 10:16 a.m. que estaba camino a su casa porque el examen se lo habían cambiado.[7] Indicó que le dijo a su hija que tenían almuerzo ya hecho que comiera y se llevara para que no tuviera que cocinar.[8] Expresó a las 11:20 a.m., Almodóvar Ojeda le dijo que iba para la casa de su amiga Génesis porque se le quedó su

---

[2] *Véase*, Transcripción de la prueba oral, pág. 9.
[3] *Véase*, Transcripción de la prueba oral, pág. 10.
[4] Íd.
[5] *Véase*, Transcripción de la prueba oral, pág. 11.
[6] Íd.
[7] *Véase*, Transcripción de la prueba oral, pág.12.
[8] Íd.

cargador. Almodóvar Ojeda llevó a su amiga para el Hospital Metropolitano porque un amigo estaba recluido. [9]

Declaró que a eso de las 6:55 p.m. del 17 de diciembre de 2018, el señor Antommattei Pasavento le envió un mensaje diciéndole que su hija no había llegado, que se supone que ella llegara a la 1:00 p.m. y que eran las 7:00 p.m. y no había llegado.[10] Expresó que procedió a llamarla pero que su celular estaba apagado.[11] Así que decidió verificar su celular porque ella le había puesto un rastreador (en adelante, "GPS") a la guagua que Almodóvar Ojeda utilizaba. Al verificar la trayectoria, se percató que la guagua se encontraba entre medio de McDonald's y Walgreens de la Avenida Las Américas de Ponce, a eso de las 9:00 p.m.[12] Le compartió la dirección al señor Antomattei Pasavento y él le dijo que por ahí hay un residencial que es caliente y ella le dijo que no se metiera para allá.

Testificó que, al otro día, es decir, martes en la mañana, el señor Antomattei Pasavento le preguntó si sabía de ella y que le respondió que no.[13] Declaró que el novio le dijo "yo espero que esté bien y respirando".[14] Contó que fue a la casa de Génesis y que ésta le dijo que Almodóvar Ojeda estuvo con ella y que le entregó el cable del teléfono y que Almodóvar Ojeda la llevó al hospital y que lo siguió para su casa. Luego continuó verificando el GPS con su esposo y vio que la guagua subió y bajó para el Municipio de Adjuntas varias veces cerca del Lago Garza. Relató que el miércoles su esposo verificó las noticias y se percató que encontraron a una mujer en el Lago Garza y que éste pensó que se trataba de su hija.[15] Expresó que fue a la Universidad Católica de Mayagüez y habló con personal de seguridad de la institución y le enseñó una fotografía de su hija y fue reconocida como una estudiante de comunicaciones y expresó no haberla visto ese día. La señora Ojeda Pérez se dirigió a la oficina de Rectoría y se encontró con la profesora de inglés que le iba a dar el examen

---

[9] *Véase*, Transcripción de la prueba oral, pág.14.
[10] *Véase*, Transcripción de la prueba oral, pág. 15.
[11] Íd.
[12] *Véase*, Transcripción de la prueba oral, pág. 16.
[13] *Véase*, Transcripción de la prueba oral, pág.17.
[14] Íd.
[15] *Véase*, Transcripción de la prueba oral, pág. 18.

y estuvo un rato ahí para ver qué podían hacer.[16] Luego fue al Cuartel de la Policía de San Germán y mientras se encontraba allí, el señor Antommattei Pasaventos le envió una foto del señor Cornier Torres c/p "Manwe Uno" y le dijo que ese señor estaba amenazando a Almodóvar Ojeda.[17] También les dijo que la guagua tenía un GPS y que podían verificarlo.[18] Expresó que luego de que le proveyó toda la información al agente Félix Rodríguez, quien junto a otros policías verificaron el GPS, y al tener conocimiento de lo que había sucedido en el Lago Garza, bajaron desde Utuado.[19] Declaró que concluyó que la mujer que había aparecido en el Lago Garza era su hija cuando fue al Tribunal de Ponce y observó a través de fotos las pertenencias de su hija incluyendo un bulto, libretas y tarjetas.[20] Le proveyó la foto del Apelante c/p "Manwe Uno" al agente Félix Rodríguez.[21] Atestiguó que en el Instituto de Ciencias Forenses la vio tan diferente y tan hinchada que expresó "yo un 98% digo que es ella".[22] Por esa razón, le dijeron que necesitaba que otro familiar que la reconociera en un 100%. A preguntas de la defensa, contestó que cuando Almodóvar Ojeda tenía problemas con su pareja, se iba para su casa. Declaró que, en una ocasión anterior, el novio de la víctima la llamó porque tuvieron un altercado y ella fue a buscar a su hija a la casa de él.[23]

### Osvaldo Andrés Antommattei Pasavento

El señor Antommattei Pasavento era el novio de la joven Almodóvar Ojeda. Éste declaró que era farmacéutico de profesión. Expresó que fue pareja de Almodóvar Ojeda por tres años y un "poquito más".[24] Manifestó que el señor Cornier Torres c/p "Manwe Uno" era amigo de su novia y que lo vio por primera vez de lejos en una discoteca y que luego lo vio en una actividad de los vejigantes.[25] Expresó que para mayo del 2018, Almodóvar Ojeda no estaba comiendo bien y que la veía triste. Contó que al

---

[16] *Véase*, Transcripción de la prueba oral, pág.19.
[17] *Véase*, Transcripción de la prueba oral, pág. 20.
[18] Íd.
[19] *Véase*, Transcripción de la prueba oral, pág. 21.
[20] Íd.
[21] *Véase*, Transcripción de la prueba oral, pág. 25.
[22] Íd.
[23] *Véase*, Transcripción de la prueba oral, pág. 32.
[24] *Véase*, Transcripción de la prueba oral, pág. 46.
[25] *Véase*, Transcripción de la prueba oral, pág. 47.

preguntarle que le pasaba ésta le dijo que el Apelante le estaba haciendo una pintura al desnudo y la segunda vez se propasó con ella y que ella logró escaparse.[26] Declaró que el sábado, 15 de diciembre de 2018, era la fiesta de Navidad de la farmacia donde trabajaba y que llegó alrededor de las 5:30 p.m.[27] Expresó que a las 7:00 p.m. llamó a su mamá para que lo buscara a la fiesta porque estaba tomado. Declaró que cuando la mamá llegó a buscarlo, unos compañeros del trabajo lo montaron en la guagua y que se cayó y lo treparon otra vez.[28] Mencionó que se cayó dos veces. Indicó que su mamá lo llevó a su casa en Quintas de Monserrate. Declaró que el domingo, 16 de diciembre de 2018, fue al Museo de Arte de Ponce con Almodóvar Ojeda.[29]

El señor Antommattei Pasavento testificó que el lunes, 17 de diciembre de 2018, se levantó a las 7:30 a.m. y que Almodóvar Ojeda iba para Mayagüez a tomar un examen en la Universidad Católica. Expresó que ésta se fue en la guagua Nissan, modelo Pathfinder color marrón que le dio su papá para estudiar en Mayagüez. Indicó que cuando la víctima se fue, él se acostó a dormir y que se volvió a despertar como a eso de las 11:00 a.m.[30] Cuando se despertó la llamó y le texteó. Almodóvar Ojeda le preguntó qué quería de comer y le comentó que estaba con su amiga Génesis y que tenía que ir al Hospital La Concepción en San Germán porque un amigo se trató de suicidar.[31] También le dijo que le cambiaron el examen para el miércoles. Más adelante, casi llegando a las 12:00 p.m., Almodóvar Ojeda le dijo que estaba en la casa de sus padres y le preguntó qué quería de comer.[32] El señor Antommattei Pasavento manifestó que en ese momento su relación con Almodóvar Ojeda estaba muy bien. Expresó que la conversación con Almodóvar Ojeda paró ahí. Específicamente, indicó que: "ni los textos, ni llamadas, nada, nada, nada, paró".[33] Intentó comunicarse nuevamente con Almodóvar Ojeda a las 2:00 p.m., a través

---

[26] *Véase*, Transcripción de la prueba oral, pág. 52.
[27] *Véase*, Transcripción de la prueba oral, pág. 63.
[28] *Véase*, Transcripción de la prueba oral, pág. 64.
[29] *Véase*, Transcripción de la prueba oral, pág. 71.
[30] *Véase*, Transcripción de la prueba oral, pág. 77.
[31] *Véase*, Transcripción de la prueba oral, pág. 78.
[32] *Véase*, Transcripción de la prueba oral, págs. 78 y 80.
[33] *Véase*, Transcripción de la prueba oral, pág.80.

de mensaje de texto y también la llamó en varias ocasiones.[34] Indicó que tuvo que salir a comprar hielo como a las 4:00 p.m. Expresó que llamó a la señora Ojeda Pérez porque estaba bien preocupado porque Almodóvar Ojeda no lo había llegado. Pensó que le pudo haber pasado algo o que volvió con el Apelante.[35] Sostuvo que a las 9:00 p.m., la señora Ojeda Pérez le envió captura de pantalla ("screenshot") con una localización y que él no sabía que había GPS en el carro.[36] Este se vistió y fue hasta el lugar que decía la localización, el cual era un McDonald's al lado de un Walgreens.[37] Al llegar, no había nadie en el estacionamiento.[38] Luego pasó por casa de un amigo de Almodóvar Ojeda, el Sr. Roberto Hernández (en adelante, "Bobby"), vio que la guagua de Almodóvar Ojeda no estaba ahí y lo siguió para su casa.

El señor Antommattei Pasavento expresó que a eso de la 1:22 a.m. del 18 de diciembre de 2018 le escribió a Almodóvar Ojeda.[39] No recibió respuesta a estos mensajes.[40] Mencionó que, para la fecha del 15, 16 y 17 de diciembre de 2018 tenía dos perros grandes.[41] Atestiguó que el mismo 18 de diciembre de 2018, en horas de la tarde, fue con su compañero de piso, el Sr. Carlos Enrique Amil (en adelante, el "señor Amil" o "Quique") al McDonald's, pero regresaron porque era peligroso. La señora Ojeda Pérez volvió a enviarle una captura de pantalla con una nueva localización que resultó ser del estacionamiento del Tribunal de Ponce.[42] Expresó que el miércoles, 19 de diciembre de 2018, la policía lo llamó al cuartel de San Germán.[43] Por último, testificó que le envió a la señora Ojeda Pérez una foto del señor Cornier Torres porque este último había amenazado a Almodóvar Ojeda y a él. Indicó que Almodóvar Ojeda le había dicho que el Apelante le dijo que si ella no tenía sexo con él, los iba a matar a los dos.[44]

[34] *Véase*, Transcripción de la prueba oral, pág. 82.
[35] *Véase*, Transcripción de la prueba oral, pág. 83.
[36] *Véase*, Transcripción de la prueba oral, págs. 86 y 87.
[37] *Véase*, Transcripción de la prueba oral, pág. 83.
[38] *Véase*, Transcripción de la prueba oral, pág. 93.
[39] *Véase*, Transcripción de la prueba oral, pág. 94.
[40] *Véase*, Transcripción de la prueba oral, pág. 96.
[41] *Véase*, Transcripción de la prueba oral, pág. 98.
[42] *Véase*, Transcripción de la prueba oral, pág. 99.
[43] *Véase*, Transcripción de la prueba oral, pág.104.
[44] *Véase*, Transcripción de la prueba oral, pág.105.

**Rosa Marina Rodríguez Castillo**

La Dra. Rosa Marina Rodríguez Castillo (en adelante la "Dra. Rodríguez Castillo") es patóloga forense del Instituto de Ciencias Forenses.[45] Testificó que la autopsia fue realizada el 21 de diciembre de 2018 alrededor de las 7:30 a.m.[46] Expresó que la occisa fue identificada por su padre como la joven Almodóvar Ojeda. Indicó que analizó la superficie corporal, que se le tomaron muestras de toxicología y pudo ver una fotografía del instrumento utilizado para proporcionar las heridas. Respecto al examen externo del cuerpo, indicó lo siguiente:

> R. Rodríguez: Ok, en este caso en particular describimos la superficie externa, como esta ese cuerpo, que lesiones tiene "Ininteligible" traumática verdad, y que intervención, si tiene alguna médica. En este caso en particular, recibimos un cuerpo que estaba envuelto en una funda plástica negra. A su vez, estaba eh, circunferencialmente eh, envuelta con una cinta adhesiva transparente, a su vez, tenía un cable eléctrico negro con un receptáculo en la parte inferior del cuerpo y a su vez, a la remoción de esto, tenía un edredón, que es de un edredón por dos partes verdad, en una parte blanca, en otra parte tenía diseños geométricos gris. Y a su vez, tenía una vestimenta que corresponde a una camisilla deportiva de estas de maguillos spaghetti straps de aparente color marrón. Una falda color vino, una ropa color turquesa y unas tenis converse negras. A la remoción de todas estas piezas en el cuerpo se evidencia un cuerpo de una mujer de la raza blanca con una edad establecida de 23 años, con una estatura de 64 pulgadas y un peso aproximado de 134 libras. Al examen del cuerpo a su vez, tenía cambios tempranos por descomposición que ocupaban la parte anterior y posterior de la cara, el cuello, las extremidades superiores que consiste decoloración violácea verdosa, desprendimiento focal de la epidermis, la parte anterior y posterior del cuello. Visualización de los vasos superficiales y reblandecimiento leve de órganos internos. Este cuerpo cuando se recibe, además, tenía en su mano una cintilla violeta que decía Museo de Ponce, Museo de Arte de Ponce. Y tenía las manos cubiertas con bolsa de traza.[47]

La Dra. Rodríguez Castillo expresó que, en este caso en particular como evidencia de trauma, el cuerpo tenía 38 heridas de arma blanca.[48] Manifestó que todas las heridas eran compatibles con una misma característica o un mismo instrumento.[49] También expresó que el cuerpo tenía heridas a nivel de los muslos.[50] Indicó que en el contexto forense

---

[45] *Véase*, Transcripción de la prueba oral, pág. 617.
[46] Íd.
[47] *Véase*, Transcripción de la prueba oral, pág. 619.
[48] *Véase*, Transcripción de la prueba oral, pág. 621.
[49] *Véase*, Transcripción de la prueba oral, pág. 622.
[50] *Véase*, Transcripción de la prueba oral, pág. 624.

cuando existen heridas de arma blanca en las extremidades inferiores, como los muslos, es que la persona se encontraba en un plano inferior.[51] Esto es un plano donde la persona está incapacitada, restringida y su actividad física es mínima.[52] Expresó que una persona en esas circunstancias lo más que puede hacer es arrastrarse. Mencionó que las heridas eran casi equidistantes, lo que es compatible con que se encontraba en una posición boca abajo y no se pudo mover de ahí.[53] La herida "W" reflejó que quisieron desarticular la cabeza o degollarla.[54] Respecto al análisis de evidencia externa indicó lo siguiente:

> R. Rodríguez: Ok. Pues, en los hallazgos en este caso, pues son este, los traumáticos asociados a algunas heridas de arma blanca que producen daños como fue en la grasa del riñón izquierdo, en el vaso, en el pulmón izquierdo. Eh, las estructuras de, de la estructura de la vaina carotidea izquierda.
>
> F. Gierboini: Mjm.
>
> R. Rodríguez: Los planos musculares, están afectados porque rompen, ahí hay vasos y se van rompiendo. O sea, que, aunque no haya cogido algunas heridas, no haya cogido órganos, sangran. Pues tienen "ininteligible"… Le voy hacer, le voy a decir aquí este, que daños produjo, pulmón izquierdo, la fractura de la segunda vertebra cervical en su aspecto lateral izquierdo. Este pulmón, vaso, diafragma, esos son los órganos más afectados en este caso en particular de las heridas.[55]

Por último, la Dra. Rodríguez Castillo testificó que la causa de la muerte de la joven Almodóvar Ojeda fueron las heridas de arma blanca y que, en el contexto forense, ello se refería a un homicidio.[56]

**Ruth Cardona Lugo**

La Sra. Ruth Cardona Lugo (en adelante, "la señora Cardona Lugo"), es seróloga forense del Instituto de Ciencias Forenses.[57] Testificó que el certificado de análisis forenses de ADN fue realizado el 28 de febrero de 2019, el cual fue solicitado por el agente Félix Rodríguez Cortez (en adelante, "Agt. Rodríguez Cortez").[58] Expresó que entre la evidencia que

---

[51] *Véase*, Transcripción de la prueba oral, pág. 626.
[52] Íd.
[53] *Véase*, Transcripción de la prueba oral, pág. 627.
[54] *Véase*, Transcripción de la prueba oral, pág. 634.
[55] Íd.
[56] *Véase*, Transcripción de la prueba oral, pág. 637.
[57] *Véase*, Transcripción de la prueba oral, pág. 650.
[58] *Véase*, Transcripción de la prueba oral, pág. 653.

analizó se encontraba un cuchillo, calzado, pedazos de tela, pedazos de cojín, pedazos de sofá, aplicadores que se tomaron a la víctima en diferentes partes de su cuerpo y raspados de uña.[59] Mencionó que las muestras de referencia que estuvo recibiendo fueron las del señor Cornier Torres, el señor Pacheco Santiago y la señora Bonet Torres.[60] Expresó que se detectó sangre humana, de primate o de hurón en la hoja del cuchillo, en el corte que se llevó a cabo de un calzado derecho, en un pedazo de tela, en tela de un cojín, en la tela de espaldar de un sofá y de un aplicador levantado de un cable.[61] Comparó el ADN que se recuperó de cada una de estas piezas y concordaban con el ADN de la víctima.[62] Respecto a la empuñadura de cuchillo, testificó que ésta presentaba un perfil genético de más de una persona.[63] Asimismo, atestiguó que la mayor contribuyente de ADN fue Almodóvar Ojeda y el menor contribuyente de ADN fue el señor Cornier Torres.[64]

### Omar Arquelio Binet Ojeda

El Sr. Omar Arquelio Binet Ojeda (en adelante, el "señor Binet Ojeda") testificó que trabaja en una farmacéutica, como representante médico y que era primo hermano de la señora Ojeda Pérez.[65] Expresó que cuando comenzó el proceso de desaparición de Almodóvar Ojeda, la señora Ojeda Pérez le indicó que había integrado al vehículo el dispositivo "sign of brite" de T-Mobile. Expresó que desde ese momento comenzó a estudiarlo para poder ayudarla dentro del proceso.[66] Sostuvo que al verificar el historial del GPS, se mostraban los diferentes movimientos que había tenido el vehículo.[67] Expresó que el automóvil había comenzado las rutas a las 7:42 a.m. del 17 de diciembre de 2018 y terminó el 18 de diciembre de 2018 a las 7:50 a.m. en el Tribunal de Ponce.[68] Indicó que el GPS tenía la capacidad de determinar cuándo el vehículo estaba

---

[59] Íd.
[60] *Véase*, Transcripción de la prueba oral, pág. 656.
[61] *Véase*, Transcripción de la prueba oral, pág. 657.
[62] *Véase*, Transcripción de la prueba oral, pág. 661.
[63] *Véase*, Transcripción de la prueba oral, pág. 664.
[64] *Véase*, Transcripción de la prueba oral, págs. 665 y 668.
[65] *Véase*, Transcripción de la prueba oral, págs. 704 y 706.
[66] *Véase*, Transcripción de la prueba oral, pág. 706.
[67] *Véase*, Transcripción de la prueba oral, pág. 710.
[68] *Véase*, Transcripción de la prueba oral, pág. 711.

encendido o apagado, lo que le permitía establecer rutas de navegación de acuerdo con dicha información.[69] Expresó que en este caso en particular, el GPS pudo trazar diez (10) rutas.[70] Testificó que la primera ruta comenzó a las 7:42 a.m. el 17 de diciembre de 2018, en el hogar del señor Antomattei Pasavento ubicado en la calle El Greco en Ponce.[71]

Ella continuó desde Ponce hasta la Universidad Católica de Mayagüez con un tramo de 58 minutos.[72] A las 10:00 a.m., prendió de nuevo el vehículo y llegó a las 10:23 a.m. a la casa de su amiga Génesis en el Municipio de San Germán.[73] A las 11:17 a.m., salió de la casa de Génesis y se dirigió hacia el Hospital Metropolitano de San Germán. A las 11:32 a.m., llegó a la calle Suecia en San Germán donde vive la señora Ojeda Pérez.[74] A las 11:56 a.m., estuvo en la calle Luna donde ubica la gasolinera Puma en San Germán.[75] La próxima ruta comenzó a las 11:59 a.m. desde la calle Luna en San Germán hasta la calle Global en Ponce. Llegó a la calle Global en Ponce a la 1:28 p.m.[76] El vehículo estuvo detenido en ese punto desde la 1:28 p.m. hasta la 1:51 p.m.[77] Luego partió de la calle Global hasta la calle Gardel en Ponce, con una ruta de 18 minutos.[78] Posterior a eso, hubo una ruta de dos minutos desde las 2:30 p.m. hasta las 2:32 p.m., donde el vehículo terminó en la Avenida Roosevelt.[79] La cuarta ruta comenzó a las 2:38 p.m. en la calle A en Ponce y paró en los predios de la pizzería Campionni.[80] Luego entró a la gasolinera Puma y fue estacionado.[81] Posterior a eso, entró al residencial Chavier.[82]

Al salir del residencial, tomó la Avenida Roosevelt, dobló a la izquierda hacia el este y luego dobló a la calle Gardel donde llegó a un punto y terminó en un área baldía.[83] La quinta ruta comenzó en la calle

---

[69] Íd.
[70] *Véase*, Transcripción de la prueba oral, pág. 712.
[71] Íd.
[72] *Véase*, Transcripción de la prueba oral, pág. 715.
[73] Íd.
[74] *Véase*, Transcripción de la prueba oral, pág. 717.
[75] *Véase*, Transcripción de la prueba oral, págs. 716 y 717.
[76] *Véase*, Transcripción de la prueba oral, pág. 718.
[77] *Véase*, Transcripción de la prueba oral, pág. 722.
[78] *Véase*, Transcripción de la prueba oral, pág. 723.
[79] *Véase*, Transcripción de la prueba oral, págs. 724 y 726.
[80] *Véase*, Transcripción de la prueba oral, págs. 729 y 730.
[81] *Véase*, Transcripción de la prueba oral, pág. 730.
[82] *Véase*, Transcripción de la prueba oral, pág. 730.
[83] Íd.

Global a las 3:47 p.m. y terminó en la Avenida Roosevelt a las 4:01 p.m.[84] La sexta ruta comenzó a las 5:44 p.m. de la tarde y duró un minuto.[85]. El señor Binet Ojeda observó que el vehículo hizo un movimiento y quedó en retroceso a una residencia.[86] Movieron el vehículo de la parte de al frente a una parte de una marquesina.[87] La séptima ruta comenzó en la Avenida Roosevelt a las 6:14 p.m.[88] Hubo una trayectoria de 14 minutos.[89] Su destino fue la gasolinera Samuel a las 6:27 p.m.[90] La octava ruta comenzó a las 6:30 p.m. y el vehículo tomó la calle Ponceña número 123 con destino al Municipio de Adjuntas.[91] El vehículo frenó bruscamente en la carretera 518 en Adjuntas.[92] Hubo dos frenadas más.[93] El punto más lejano que visitó el vehículo fue el área de la 180816 grados norte, 664336 grados oeste cerca del Lago Garza en Adjuntas.[94] Más adelante, el vehículo se detuvo en el Centro Comercial de Juana Díaz.[95] Luego regresó a Ponce, vía la autopista Luis A. Ferré y llegó a la casa que se encuentra en la coordenada 180030 N, 663748.[96] La próxima ruta termina en el McDonald's de las Américas en Ponce a las 9:12 p.m.[97] Luego el vehículo se estacionó entre el Mcdonald's y el Walgreens.[98] Después de eso, el vehículo llegó al residencial Arístides Chavier.[99] La ruta terminó en la casa en la Avenida Roosevelt a las 9:39 p.m.[100] El vehículo se volvió a encender a las 7:28 a.m. del 18 de diciembre de 2018 y se dirigió al Tribunal de Ponce, vía Avenida Roosevelt calle Simón.[101] La ruta terminó en el estacionamiento de dicho Tribunal a las 7:50 a.m.[102]

**Agente Igneris Negrón**

---

[84] *Véase*, Transcripción de la prueba oral, pág. 731.
[85] *Véase*, Transcripción de la prueba oral, pág. 733.
[86] Íd.
[87] Íd.
[88] *Véase*, Transcripción de la prueba oral, pág. 735.
[89] Íd.
[90] *Véase*, Transcripción de la prueba oral, pág. 737.
[91] Íd.
[92] *Véase*, Transcripción de la prueba oral, pág. 738.
[93] *Véase*, Transcripción de la prueba oral, pág. 739.
[94] Íd.
[95] Íd.
[96] *Véase*, Transcripción de la prueba oral, pág. 740.
[97] *Véase*, Transcripción de la prueba oral, pág. 742.
[98] *Véase*, Transcripción de la prueba oral, pág. 743.
[99] Íd.
[100] *Véase*, Transcripción de la prueba oral, pág. 744.
[101] *Véase*, Transcripción de la prueba oral, pág. 745.
[102] Íd.

La agente Igneris Negrón (en adelante, la "Agt. Negrón") testificó que es examinadora forense digital de la Unidad Investigativa del Departamento de Justicia. Declaró que ella hizo la extracción del celular teléfono celular marca Iphone de Almodóvar Ojeda.[103] Indicó que el reporte se hizo de la conversación de Almodóvar Ojeda con sus contactos de celular denominados como "Manwe" y "Godfather". Expresó que la conversación con "Manwe" inició a las 7:43 am del 17 de diciembre de 2018, cuando Almodóvar Ojeda le escribió "Buenos días".[104] Respecto a esta conversación, testifico lo siguiente:

> F. ROSA: ok… Ella escribe buenos días a las 7:43 de la mañana con 48 segundos, ¿y que es el próximo mensaje que usted tiene ahí?
> I. NEGRÓN: Escribe, "Subo a las, a las 11:00 o, 11:00 a 12:00."
> F. ROSA: Ok. ¿Y eso se escribió a qué hora?
> I. NEGRÓN: A las 7:44 con 12 segundos, am.
> F. ROSA: Ok. ¿Qué paso después en esa conversación de ese día?
> I. NEGRÓN: Manwe le envía un audio…(PRESENTA AUDO DEL ACUSADO)
> F. ROSA: ¿Eso fue a que hora?
> I. NEGRÓN: 7:52 CON 49 SEGUNDOS, am.
> F. ROSA: Ok. Posterior a ese mensaje de audio ¿Qué paso?
> I. NEGRÓN: Ella, Valerie Ann le envía un mensaje de audio… (PRESENTA AUDIO)
> F. ROSA: Luego de esa, de esa respuesta en mensaje de audio, ¿Qué paso?
> I. NEGRÓN: EL le contesta…
> F. ROSA: ¿A que hora?
> I. NEGRÓN: 7:57 CON 46 segundos de la mañana. ( PRESENTA AUDIO)
> F. ROSA: ¿Luego de ese audio?
> I. NEGRÓN: El le envía otro audio, 7:58 con 7 segundos de la mañana (PRESENTA AUDIO)
> F. ROSA: Continue.
> I. NEGRÓN: Ella le responde a las 7:48 con 17 segundos, am. (PRESENTA AUDIO)… El le envía otro mensaje de voz a las 7:58, 49 segundos, am, (PRESENTA AUDIO)…Ella le responde a las 7:59 am, "subo" y "jajaja, estoy loca." 7:59 con 5 segundos…El le responde a las 7:59 con 10 segundos, am (PRESENTA AUDIO)… Ella le escribe un "lol" a conocimiento, pues como una risa.
> F. ROSA: ¿A que hora fue eso?
> I. NEGRÓN: 7:49 con 19 segundos, am. Y le escribe "Dale" 7:59 con 25 segundos, am…. El le contesta "Ok" a las 7:59 con 37 segundos, am…Ella le contesta a las 7:59 con 44 segundos, am (PRESENTA AUDIO)…A las 10:15 con 6 segundos, am envia un audio Valerie Ann (PRESENTA AUDIO)…10:15 con 15 segundos, Vale vuelve a enviar un audio (PRESENTA AUDIO)…10:15 con 38 segundos, am (PRESENTA AUDIO)…Manwe le escribe, "estoy trabajando." A las 10:15 y 54 segundos, am. Vale le escribe "ok" a las

[103] *Véase*, Transcripción de la prueba oral, pág. 753.
[104] *Véase*, Transcripción de la prueba oral, pág. 757.

10:16 con 2 segundos, am. "Te aviso horita" a las 10:16 con 19 segundos, am. "Horit" 10:16 con 2 segundos, am. El le escribe, Manwe le contesta "ok" a las 10:16 con 42 segundos, am. A las 12:31 con 24 segundos, pm, ella le, Vale le escribe a Manwe "¿dónde estás? y signos de interrogación a las 12:31 con 26 segundos pm. Manwe le contesta "En Ponce" a las 12:31 con 43 segundos pm. "Pueblo" 12:31 con 46 segundos, pm. Vale le escribe "meet how" 12:31 con 48 pm. "¿Dónde te veo?" a las 12:31 con 58 segundos, pm. "A" signos de interrogación, 12:33 con 37 segundo, pm. "Dímelo" 12:35 con 8 segundos, pm. Manwe le escribe una "A" a las 12:41 y 46 y un audio a las 12:41 con 46 (PRESENTA AUDIO) … Vale le escribe "ok" 12:41 con 59. "Yo voy por casa de Bob" a las 12:42 con 21 segundos, pm. Manwe escribe "jajaja" 12:42 con 25 pm. Vale le escribe, "¿pues podrás pararte mas cerca?" 12:43 con 19 segundos, pm. "Estoy por Tasty Chicken" a las 12:43 con 34 segundos, pm. "Te puedo esperar en la panaderia sigo 21 o Guarina? A las 12:44 y 17 pm. "O ya lo seguiste?" 12: 44 con 22 segundos, pm "Enviar pin" 12:52 con 28 segundos, pm. "Siempre me pierdo" 12:52 con 34 segundos, pm. "Estoy perdida". 12: 52 con 37 minutos, pm. "jajaja" 12:50 con 38 segundos, pm. "Estoy en el semáforo" 12:52 con 44 segundos, pm. Aquí se ve Manwe le envía un pin…Tengo que copiar latitud y longitud, ya hice el ejercicio aquí. Si podemos observar es 18.008436, latitud-66.629944. Esto es un mapa ya yo hice el ejercicio pero no tengo internet, por eso ya esta el ejercicio hecho. Este es el pin que, Manwe le envia a Valerie Ann, es Avenida Roosevelt.

[…]

F. ROSA: ¿Qué información tiene eh, que surja, de ahí, Avenida Roosevelt?
I. NEGRÓN: Es la residencia de Manwe.
F. ROSA: Ok.
I NEGRÓN: Es la tercera casa, de esta, esta tercera casa, seria por aquí.
F. ROSA: Ok. Luego de que le envia el pin. ¿Cuál es, que es lo próximo que sucede en esa conversación?"
I. NEGRÓN: "Ya di la vuelta como cuatro veces"
F. ROSA: ¿A que hora fue eso?
I. NEGRÓN: 12:58 con 24 segundos, pm. (PRESENTA AUDIO)
F. Rosa: ¿A que hora fue ese audio?
I. NEGRÓN: 12:59 con 40 segundos, pm… A la 1:00 y 43 segundos escribe "Ahora". 1:00:49 segundos dice "Estoy cerca." A la 1:34 con 7 segundos, pm, Manwe le escribe, "me fui, mano porque mami me vino a buscar"

[…]

I. NEGRÓN: Como ven, en la pagina 599, lo mismo que leímos que es la comuni, las comunicaciones entre Manwe y Valerie Ann, que sale aquí el "ya di la vuelta como cuatro veces" a las 12:58. Asi seguimos viendo la misma conversación, "estoy cerca" "me fui mano, porque me vino a buscar." La ultima vez que en el celular de Valerie Ann se ve un outgoing, la ultima vez que Valerie Ann cogio ese teléfono y hizo una comunicación con alguien que el teléfono hizo algo outgoing, fue a la 1:00 y 49 segundos, pm. De ahí mas nunca ella utilizo ese, ella volvió a utilizar ese celular. Incluso se ve en el próximo mensaje, que es el que envia Manwe, que lo vemos…voy a volver otra vez a la, a la convservacion en WhatsApp que es donde yo puedo leer…ese mensaje ella

nunca lo leyó. Ella no abrió ese mensaje. Entonces sale unread, que quiere decir que ella no leyó ese mensaje.[105]

Respecto a la localización del celular del señor Cornier Torres indicó lo que sigue:

> I. NEGRÓN: A las 6:11 de la, de la, pm. seria de la noche, ese celular se encuentra en el área de Ponce. A las 7:28 con 5 segundos de la noche, esa antena esta en Adjuntas. 7:31 hay una interacción también en Adjuntas. A las 7:42 de la noche con 45 segundos está en la antena en Adjuntas. A las 7:43 con 7 segundos eh, el celular continua en la antena de Adjuntas. A las 8:13 con 42 segundos de la noche, está en una antena en Juana Diaz y a las 9:09 con 43 segundos, está en la antena de Ponce.[106]

### Carlos Pacheco Santiago

El señor Pacheco Santiago declaró que era hojalatero de profesión y que residía en la Baldorioty cerca de la Chavier desde hacían 50 años.[107] Testificó que conocía al señor Cornier Torres hacía aproximadamente un año y pico porque vivía dos calles más abajo de su casa.[108] Expresó que el 17 de diciembre de 2018 mientras se encontraba en su casa viendo televisión, el señor Cornier Torres c/p Manwe Uno llegó a buscarlo en una guagua Pathfinder.[109] Manifestó que el Apelante le dijo que había matado a una muchacha y que necesitaba que lo ayudara a limpiar y a botarla.[110] Indicó que no le creyó y se fue con el señor Cornier Torres para su casa.[111] Expresó que el Apelante entró primero a la casa y que él fue el segundo en hacerlo.[112] Mencionó que cuando entró vio un cadáver boca abajo en el piso.[113] También declaró que ella estaba tratando de respirar y que el señor Cornier Torres le puso la pierna en la espalda y la alzó por el pelo y le dio cuatro puñaladas más.[114] Señaló que esas puñaladas se las dio por el cuello con un cuchillo verde.[115] Asimismo, expresó que le preguntó al señor Cornier Torres qué estaba haciendo y que éste guardó silencio.[116]

---

[105] *Véase*, Transcripción de la prueba oral, pág. 767.
[106] *Véase*, Transcripción de la prueba oral, pág. 771.
[107] *Véase*, Transcripción de la prueba oral, pág. 239.
[108] *Véase*, Transcripción de la prueba oral, pág. 240.
[109] *Véase*, Transcripción de la prueba oral, págs. 240-241.
[110] *Véase*, Transcripción de la prueba oral, pág. 241.
[111] Íd.
[112] *Véase*, Transcripción de la prueba oral, pág. 242.
[113] Íd.
[114] Íd.
[115] *Véase*, Transcripción de la prueba oral, pág. 243.
[116] Íd.

El señor Pacheco Santiago relató que el Apelante le buscó veinte (20) dólares para que lo ayudara a limpiar y los utilizara para curarse porque es usuario de heroína y cocaína.[117] Indicó que en lo que el señor Cornier Torres buscaba el dinero, tiró un poquito de Ace y Clorox en el piso al frente del cadáver y se hizo que mapeó.[118] Luego, para salir por la parte de atrás de la casa, junto al Apelante movió un chinero que había en el medio. Cuando iba a salir vio una muchacha trigueña en el baño que parecía que estaba orando.[119] Expresó que luego se dirigió a lavar algunos vehículos y que, al concluir esa tarea, se encontró al Apelante c/p Manwe Uno en la calle en la guagua Pathfinder, en compañía de la muchacha trigueña.[120] Declaró que, posteriormente cuando se lo encontró, el señor Cornier Torres le dijo que había "botao" a la muchacha que mató. Este también dijo que después de eso, se encontraban con poca frecuencia.[121] Posteriormente, a preguntas del fiscal, el señor Pacheco Santiago mencionó que en el momento en que el Apelante le pone el pie y con el cuchillo le da las puñaladas le dijo "aquí está la chota esta".[122]

### Loraine Bonet Torres

La señora Bonet Torres testificó que es terapeuta clínica de profesión y que fue pareja del señor Cornier Torres.[123] Expresó que el señor Pacheco Santiago era vecino del Apelante y que era conocido como Amarillo.[124] Manifestó que conoció al señor Cornier Torres vía internet entre el 26 y 27 de noviembre de 2018 y que la primera vez que lo vio fue el 27 de noviembre de 2018, en una actividad donde él participaba en un local en el Municipio de Ponce.[125] Indicó que compartió con él hasta el día 28 de noviembre de 2018 por la madrugada y que fueron a comer a un buffet localizado en dicho Municipio.[126] Declaró que el 6 de diciembre de 2018 se dirigió al Municipio de Ponce porque el Apelante se había desaparecido

---

[117] Íd.
[118] *Véase*, Transcripción de la prueba oral, pág. 244.
[119] *Véase*, Transcripción de la prueba oral, pág. 245.
[120] *Véase*, Transcripción de la prueba oral, págs. 245-246.
[121] Íd.
[122] *Véase*, Transcripción de la prueba oral, pág. 254.
[123] *Véase*, Transcripción de la prueba oral, pág. 319.
[124] Íd.
[125] *Véase*, Transcripción de la prueba oral, pág. 320.
[126] *Véase*, Transcripción de la prueba oral, pág. 321.

después de haber compartido un fin de semana.[127] Expresó que a partir de ese día comenzó a convivir con el señor Cornier Torres en la Avenida Roosevelt en el Municipio de Ponce porque el Apelante le dijo que "fuera a Ponce a vivir lo que él vivía".[128] Especificó que vivió en esa casa desde el 6 de diciembre de 2018 hasta el 18 de diciembre de 2018.[129]

La señora Bonet Torres declaró que el domingo 16 de diciembre de 2018, el Apelante le dijo que había recibido una correspondencia del Tribunal y que tenía vista al otro día.[130] Expresó que el lunes, 17 de diciembre de 2018 se levantó a las 7:00 a.m.[131] Mencionó que ese día el Apelante y ella se fueron a trabajar a pintar un mural en un restaurante argentino en la guagua de ella y que el señor Cornier Torres era el que conducía.[132] Indicó que el no duró mucho ese día en el trabajo. Expresó que fueron a trabajar como a las 7:00 a.m. y que él se fue como a las 8:00 a.m. y ella se quedó sola trabajando.[133] Especificó que él se fue en la guagua de ella y le dijo que iba a hacer unas diligencias.[134] Testificó que el señor Cornier Torres salió como tres (3) veces mientras ella estuvo trabajando y que el Apelante le dijo que iba a llevar un dinero a su tesorera.[135] Indicó que no supo nada de él hasta las 3:00 p.m. de ese día.[136]

Expresó que el dueño del restaurante le dijo que el Apelante estaba preguntando por ella así que procedió a llamarlo.[137] Manifestó que al lograr comunicarse con él, éste le dijo que había hecho algo malo y ella le preguntó por su guagua y él le dijo que la guagua estaba bien.[138] Expresó que el Apelante le contó que había matado a alguien, pero que ella no lo tomó como nada serio, pues solo pensaba en su guagua.[139] Relató que el

---

[127] *Véase*, Transcripción de la prueba oral, pág. 326.
[128] *Véase*, Transcripción de la prueba oral, pág. 328.
[129] Íd.
[130] *Véase*, Transcripción de la prueba oral, pág. 361.
[131] Íd.
[132] *Véase*, Transcripción de la prueba oral, pág. 365.
[133] Íd.
[134] *Véase*, Transcripción de la prueba oral, págs. 366 y 367.
[135] *Véase*, Transcripción de la prueba oral, pág. 372.
[136] Íd.
[137] *Véase*, Transcripción de la prueba oral, pág. 386.
[138] Íd.
[139] *Véase*, Transcripción de la prueba oral, pág. 387.

señor Cornier Torres pasó a buscarla en una guagua cuatro (4) puertas doradas a eso de las 3:00 p.m.[140] Se estacionaron en un garaje a conversar y que el Apelante le preguntó si quería ir a la casa, a la biblioteca o a otro lugar en Ponce.[141] Expresó que ella estaba preocupada por su guagua.[142] Luego se dirigieron a la casa del señor Cornier Torres en la avenida Roosevelt.[143] Cuando llegaron a la casa, la señora Bonet Torres le dijo que quería ver su guagua porque pensó que el Apelante la había chocado.[144] Expresó que entró sola al área de la residencia.[145] Cuando iba de camino a la parte de atrás de la casa escuchó a Amarillo dentro de la casa.[146] Esta se quedó entre el cuarto y el baño porque el Apelante le había dicho que no pasara para la sala.[147] Luego el señor Cornier Torres entró al área de la cocina. El Apelante le dijo que venía ahora porque iba a buscarle algo a Amarillo y regresó con una pastilla.[148] La señora Bonet Torres fue al baño, abrió las ventanas y encendió una vela. El Apelante se sentó en el borde de la bañera y le dijo que no la había dejado pasar a la sala porque había matado a alguien y le preguntó si les tenía miedo a los muertos, a lo que ella respondió que no.[149]

De camino a la sala le preguntó si no le creía lo que él había hecho.[150] La señora Bonet Torres testificó que en la sala estaba el cuerpo.[151] Por el cabello notó que era una mujer.[152] El cuerpo se encontraba dentro de un colchón de cama color blanco.[153] Expresó que la persona tenía unos tenis marca "Converse" color negros y que el cuerpo no era grande. Indicó que dio la vuelta y se sentó en el sillón marrón en el lado izquierdo y que el Apelante le dijo que se levantara porque ahí fue que la mató.[154] El señor Cornier Torres le dijo que no se la enseñaba porque la

---

[140] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 387 y 391.
[141] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 391.
[142] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 392.
[143] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 393.
[144] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 394.
[145] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 396.
[146] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 397.
[147] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 397 y 398.
[148] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 400 y 401.
[149] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 408.
[150] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 411.
[151] <u>Íd</u>.
[152] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 412.
[153] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 413.
[154] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 414 y 415.

había degollado.[155] La señora Bonet Torres también indicó que el Apelante le dijo que él se defendió. En específico, testificó lo siguiente:

> L. Bonet: Ahí él, él me dice, qué pues, que, que él, que él estaba afue, que, que es alguien que se, que él se defendió.
> F. Torres: Mjm
> L. Bonet: Que era, que él estaba fuera, que cuando él llegó a la casa, que él estaba con su señora madre, que le estaba entregando un dinero…
> F. Torres: Mjm.
> L. Bonet: …y que, entre ellos o él se dan, escuchan sonidos, en este, extraños.
> F. Torres: Cuando dice a ellos, ¿él y su mamá?
> L. Bonet: Fue…
> F. Torres: Lo que él estaba diciendo.
> L. Bonet: Si.
> F. Torres: Con la Voz.
> L. Bonet: Si.
> F. Torres: Aja.
> L. Bonet: Este y que entonces, que me dijo que también, que por eso era bueno conocer los, los sonidos de, de alrededor de uno.
> F. Torres: Mjm.
> L. Bonet: Y entonces pues ahí el, entro a la, a la casa…
> F. Torres: Aja.
> L. Bonet: …y que, cuando el entra a la casa lo habían enca, lo habían encañonado.
> F. Torres: Mjm… Mire y cuando él está dando este, relato a usted, ¿Cómo le hablaba? ¿Rápido, lento, norma? ¿Cómo le hablaba?
> L. Bonet: Rápido.
> F. Torres ¿Cómo usted lo percibía a él mientras él está haciendo ese relato a usted ahí en la sala frente al cadáver de esa occisa?
> L. Bonet: Eufórico, estaba acelerado.
> F. Torres: ¿Qué otra información si alguna le brindó Cornier a usted? En relación a lo que había pasado ese día.
> L. Bonet: Pues también me informa el pro, el procedimiento que pues, que, que, que surgió cuando el entro entonces a la, a la casa. Qué pues, que lo habían en, encañonado. Que el logro desarmar a la persona y con una al lado dere, al lado derecho de la puerta que hay un percher…
> F. Torres: ¿Un que?
> L. Bonet: Un perchero, un, un gancho de colocar cosas.
> F. Torres: Mjm.
> L. Bonet: Este y cuando, que en ese perchero había una pañoleta, que le, que le habían, este, regalado. Y con eso pues el, el procede este, a ya, a, como estrangular la persona para defenderse y que como la persona empezó a gri, a gritar que con la mariconera él se la puso en la boca. Y pues, en esa mariconera, eh habían, este el solía tener navajas y cosas en pues, encima.[156]

---

[155] *Véase*, Transcripción de la prueba oral, pág. 417.
[156] *Véase*, Transcripción de la prueba oral, pág. 418.

La señora Bonet Torres declaró que el Apelante le dio un saco azul y que alzó el cuerpo y le pidió que le pusiera la "funda" en la cabeza y que ella lo hizo.[157] El señor Cornier Torres le pidió que le pusiera una camisa oscura en agua.[158] También le pidió que pasara al colmado de la Baldorioty y comprara las bolsas más fuertes que consiguiera y "tape" y ella así lo hizo.[159] Al regresar del colmado, vio al señor Cornier Torres sacando unas bolsas de compra de la guagua dorada y le entregó las bolsas y el "tape".[160] Luego fue a la casa de Amarillo a buscar una ropa que se había quedado lavando.[161] A su vez, le dejó saber a Amarillo que el Apelante lo estaba esperando para que terminara con el cuerpo.[162] Esta recogió sus pertenencias y regresó a la casa del señor Cornier Torres. Cuando llegó a la casa, el apelante estaba sacando cosas de la guagua dorada y echándolas en las bolsas negras incluyendo una cartera marrón.[163] El señor Cornier Torres le pidió que continuara sacando lo que estaba en la parte de al frente de la guagua y ella lo hizo.[164]

Cuando terminó de sacar las cosas de la guagua, entró a la casa y ahí estaba el señor Cornier Torres en la sala junto al cuerpo terminando de ponerle tape. El cuerpo estaba dentro de las bolsas negras recostado de una silla y el Apelante le dijo que aguantara la silla.[165] Ambos levantaron el cuerpo y ella evitó cogerla por el área de la cabeza porque sabía que la habían degollado.[166] Ambos montaron el cuerpo en el baúl de la guagua dorada.[167] La señora Bonet Torres estaba preocupada porque se iba a quedar sola en la residencia y temía porque alguien fuera a buscar a esa persona pero que Cornier le dijo que nadie sabía que ella estaba ahí y que él había verificado todos los mensajes y el teléfono y no había nada. El señor Cornier Torres procedió a darle contra un muro al teléfono de la

---

[157] *Véase*, Transcripción de la prueba oral, pág. 423.
[158] *Véase*, Transcripción de la prueba oral, pág. 424.
[159] *Véase*, Transcripción de la prueba oral, pág. 425.
[160] *Véase*, Transcripción de la prueba oral, págs. 426 y 427.
[161] *Véase*, Transcripción de la prueba oral, pág. 426.
[162] *Véase*, Transcripción de la prueba oral, pág. 429.
[163] *Véase*, Transcripción de la prueba oral, pág. 432.
[164] *Véase*, Transcripción de la prueba oral, pág. 436.
[165] *Véase*, Transcripción de la prueba oral, pág. 439.
[166] *Véase*, Transcripción de la prueba oral, pág. 440.
[167] *Véase*, Transcripción de la prueba oral, pág. 445.

víctima, el cual se encontraba en una bolsa de marihuana.[168] Luego se montó en la guagua dorada. El Apelante le pidió un encendedor y gasolina y ella le dio un "tangonsito" de gasolina que estaba en el balcón.[169] Posteriormente, se comunicó con el señor Cornier Torres y él le dijo que estaba por Adjuntas y que se estaba demorando porque había mucha gente.[170] También le contó que había intentado prenderla pero que no había podido y que si hubiese ido otra persona con él quizás el cuerpo hubiese llegado más lejos.[171]

La señora Bonet manifestó que ella se quedó limpiando la residencia y que el Apelante regresó a la casa en la guagua Pathfinder.[172] Luego salieron porque él tenía que buscar un papel del Tribunal y fueron a una residencia utilizando la Pathfinder como medio de transporte.[173] Ahí el Apelante se bajó y ella se quedó en la guagua. Luego ella le comunicó que se sentía mal porque no había comido y él le dijo que lo sabía y que él tenía que comprar unas navajas.[174] Así que fueron a un McDonald's en la guagua Pathfinder y compraron la comida por servi-carro y luego fueron a Walgreens, pero Cornier se bajó solo.[175] Luego se dirigieron al residencial Chavier que queda cerca de la casa de Cornier.[176] En la mañana de 18 de diciembre de 2018, el Apelante tenía una vista en el Tribunal y cuando ella se levantó ya él no estaba. El Apelante se trasladó hasta al Tribunal en la guagua Pathfinder.[177] La señora Bonet Torres limpió unos zapatos del Apelante y una mancha de sangre que estaba en la puerta.[178] El Apelante le dijo a la señora Bonet Torres que le dijera a Amarillo que botara la basura.[179] El señor Cornier Torres le dijo que ya habían encontrado a la persona que él lo había visto por el televisor del Tribunal.[180] Luego del

---

[168] *Véase*, Transcripción de la prueba oral, pág. 467.
[169] *Véase*, Transcripción de la prueba oral, pág. 470 y 471.
[170] *Véase*, Transcripción de la prueba oral, pág. 474.
[171] *Véase*, Transcripción de la prueba oral, págs. 474 y 475.
[172] *Véase*, Transcripción de la prueba oral, pág. 477.
[173] *Véase*, Transcripción de la prueba oral, pág. 495.
[174] *Véase*, Transcripción de la prueba oral, pág. 496.
[175] *Véase*, Transcripción de la prueba oral, págs. 497 y 510.
[176] *Véase*, Transcripción de la prueba oral, pág. 511.
[177] *Véase*, Transcripción de la prueba oral, pág. 512.
[178] *Véase*, Transcripción de la prueba oral, pág. 492.
[179] *Véase*, Transcripción de la prueba oral, pág. 492.
[180] *Véase*, Transcripción de la prueba oral, pág. 493.

Tribunal, el Apelante le pidió que lo buscara en la calle Venus.[181] Ese día almorzaron en Adjuntas porque él tenía que hacer una diligencia allá pero fueron en la guagua de la señora Bonet Torres.[182] El Apelante dejó la Pathfinder en casa de Amarillo.[183]

### Agente Félix Rodríguez Cortez

El Agt. Rodríguez Cortez es agente investigador de la Policía de Puerto Rico.[184] Testificó que para el año 2018 trabajaba en la División de Homicidios del área de Utuado.[185] Indicó que el 18 de diciembre de 2018 se encontraba en una cita médica y que cuando regresó, el Sargento Soto Cuba le asignó una querella de una persona muerta.[186] Éste procedió a ir al área donde fueron los hechos, en el Barrio Lago Garza, carretera 518 km 3.6 en el Municipio de Adjuntas.[187] Expresó que aproximadamente a 8 pies de profundidad se encontró un cuerpo sin vida boca abajo.[188] También se encontraron varias piezas de evidencia, entre ellas, una colilla de cigarrillo, un pedazos de pintura azul y dos recibos.[189] Las bolsas negras tenían pintura de aerosol color azul en distintas tonalidades.[190] Uno de estos recibos era del Colmado Baldorioty de Ponce, ubicado en la Avenida Roosevelt y el otro de "Everyday Buffet" de la Avenida de Hostos en Ponce.[191] El recibo del Colmado Baldorioty estaba parcialmente quemado.[192] Su compañero Emil Maldonado le quitó la bolsa al cadáver.[193] Testificó que terminó de trabajar la escena a aproximadamente las 3:00 p.m. del 18 de diciembre de 2018.[194] Respecto a la verificación del cuerpo, indicó lo siguiente:

> A. Rodríguez: Si…Este, luego que se trabaja escena, pero antes, antes de, de culminar se verifico el cuerpo y se le vieron, en la parte de arriba se le vieron unas heridas. Tenía una herida abierta en el cuello, lado izquierdo.

---

[181] *Véase*, Transcripción de la prueba oral, pág. 512.
[182] *Véase*, Transcripción de la prueba oral, pág. 512.
[183] *Véase*, Transcripción de la prueba oral, pág. 513.
[184] *Véase*, Transcripción de la prueba oral, pág. 779.
[185] Íd.
[186] *Véase*, Transcripción de la prueba oral, págs. 782 y 783.
[187] *Véase*, Transcripción de la prueba oral, pág. 783.
[188] Íd.
[189] *Véase*, Transcripción de la prueba oral, pág. 784.
[190] *Véase*, Transcripción de la prueba oral, pág. 796.
[191] *Véase*, Transcripción de la prueba oral, pág. 784.
[192] *Véase*, Transcripción de la prueba oral, pág. 786.
[193] *Véase*, Transcripción de la prueba oral, pág. 790.
[194] *Véase*, Transcripción de la prueba oral, pág. 797.

Tenía un hematoma en el ojo eh, izquierdo también en la parte de arriba del ojo. Y tenía varias, varias heridas punzantes. Posterior a ahí, en esa, eh después de que se levanta el cuerpo en esa área, se pasa a la funeraria. allí en la funeraria se verifica el cuerpo de nuevo, se verifica el cuerpo y se verifican los brazos y uno de los brazos, en el brazo derecho tenia, una, una pulsera que indicaba Museo de Arte de Ponce. Color violeta.[195]

El Agt. Rodríguez Cortez declaró que al otro día verificó en el Museo de Arte de Ponce.[196] También verificó en los lugares de los recibos de compra.[197] El 19 de diciembre de 2018, solicitó una *subpoena* para la extracción de los videos del Museo.[198] En el Museo, una joven llamada Mattei Morales se le acercó y le indicó que su amiga llamada Valerie Almodóvar Ojeda estaba desaparecida.[199] El 19 de diciembre de 2018, llegó al cuartel de San Germán como a las 6:30 p.m. para entrevistar a la señora Ojeda Pérez.[200] Esta última le proveyó la descripción del vehículo que Almodóvar Ojeda utilizaba, el cual era una guagua Pathfinder color oro.[201] La señora Ojeda Pérez también le indicó que el domingo, 16 de diciembre de 2018, la víctima se había ido para la casa de su novio en Ponce porque iban para una actividad ese día y que durmió en la residencia de su novio.[202] También le contó que el lunes, 17 de diciembre de 2018, su hija tenía un examen de inglés y que se lo pospusieron para el miércoles de esa semana.[203] La señora Ojeda Pérez también le dijo que el novio de su hija a las 6:55 p.m. le envió un mensaje de texto.[204] Ojeda Pérez también le mencionó que la guagua tenía un rastreador y que ella le envió la ubicación al novio de su hija.[205] Entre las ubicaciones, se encontraban Walgreens, McDonald's y el Tribunal de Ponce.[206] El Agt. Rodríguez Cortez expresó que la señora Ojeda Pérez también le mostró una fotografía del señor Cornier Torres que le envió el señor Antommattei Pasavento.

[195] *Véase*, Transcripción de la prueba oral, pág. 797.
[196] *Véase*, Transcripción de la prueba oral, pág. 798.
[197] Íd.
[198] *Véase*, Transcripción de la prueba oral, pág. 799.
[199] *Véase*, Transcripción de la prueba oral, pág. 800.
[200] *Véase*, Transcripción de la prueba oral, págs. 800 y 801.
[201] *Véase*, Transcripción de la prueba oral, pág. 801.
[202] *Véase*, Transcripción de la prueba oral, pág. 803.
[203] *Véase*, Transcripción de la prueba oral, pág. 804.
[204] *Véase*, Transcripción de la prueba oral, pág. 805.
[205] *Véase*, Transcripción de la prueba oral, pág. 807.
[206] *Véase*, Transcripción de la prueba oral, págs. 807 y 808.

También le ensenó la ruta hacia Adjuntas y la ruta de la Baldorioty en la que estuvo ubicada la guagua en varias ocasiones.[207]

Expresó que ese miércoles entrevistó al señor Antommattei Pasavento para corroborar la información.[208] Testificó que el señor Antommattei Pasavento le dijo que el sábado, 15 de diciembre de 2018, había tenido una actividad de la farmacia y estaba bajo los efectos de bebidas alcohólicas y que su madre lo fue a buscar porque no podía manejar.[209] Expresó que el señor Antommattei le contó que el día de los hechos él se acostó a dormir y se levantó a la 1:50 p.m. aproximadamente y que salió como a las 5:00 p.m. a comprar un hielo.[210] El Agt. Rodríguez Cortez indicó que el señor Antommattei Pasavento le dijo que el señor Cornier Torres estaba haciendo un retrato desnudo de la víctima y que el intentó propasarse con ella y la amenazó.[211] Respecto a los raspados en los brazos, el señor Antommattei Pasavento le dijo que pudo haber sido por las caídas en la actividad o porque él tenía dos perros grandes.[212] El Agt. Rodríguez Cortez también entrevistó al señor Amil.[213] Luego pasó al área de Ponce a verificar la ubicación del GPS, que indicaba la casa en la Avenida Roosevelt.[214]

Según el GPS, hubo varias paradas en esa residencia, las cuales fue a corroborar.[215] Cuando llegó al lugar, la guagua estaba estacionada dentro de la residencia en retroceso.[216] Se bajó del auto y salió el señor Cornier Torres de la residencia y habló con él.[217] El Agt. Rodríguez Cortez le cuestionó de quién era la guagua y el Apelante le indicó que esa guagua era de Almodóvar Ojeda, quien la había dejado ahí y se había ido con unas amistades.[218] El señor Cornier Torres le dijo que no autorizaba a que

---

[207] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 811.
[208] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 811 y 812.
[209] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 812-815.
[210] *Véase*, <u>Transcripción de la prueba oral</u>, págs. 819-822.
[211] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 823.
[212] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 827.
[213] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 831.
[214] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 833.
[215] <u>Íd</u>.
[216] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 834.
[217] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 836.
[218] <u>Íd</u>.

registraran la guagua.[219] Indicó que la casa del Apelante se mantuvo bajo vigilancia mientras se obtenía una orden de registro y allanamiento.[220]

Luego procedió a ir al área de Utuado para consultar con la fiscalía de Utuado.[221] Sostuvo que obtuvo la orden de allanamiento para la residencia del señor Cornier Torres y la guagua.[222] Expresó que en la puerta había una mancha de aparente sangre.[223] Dentro de una bolsa de basura se encontraba una tarjeta ATH, la licencia de conducir, la tarjeta de plan médico, dos identificaciones de la Universidad Católica de Mayagüez y documentos de Almodóvar Ojeda y un vaso de McDonald's.[224] En una de las gavetas se ocupó un rollo de cinta adhesiva compatible con la que ella estaba envuelta y "tape" transparente.[225] También se ocuparon bolsas negras que eran compatibles con las que estaba envuelta la occisa.[226] Asimismo, atestiguó que encontraron un cuchillo con un cabo verde de madera dentro de un "carseat" con múltiples manchas de aparente sangre.[227] Asimismo, sostuvo que en un sofá color marrón había una aparente mancha de sangre.[228] También se ocupó en el sofá un collar en hilo que le pertenecía a Almodóvar Ojeda.[229] En el balcón encontraron un radio que le faltaba un cable y en la escena el cuerpo estaba amarrado con un cable.

De igual forma, expresó que se ocuparon unos tenis marca "nike" que tenían una mancha grande de aparente sangre.[230] En el balcón se observaron muchos envases de aerosol y grafitis.[231] Se verificaron los zafacones y dentro de las bolsas había ropa de mujer, un celular marca iPhone, color blanco con la pantalla rota y muchos accesorios de Almodóvar Ojeda.[232] El celular se encontraba dentro de un empaque que

[219] *Véase*, Transcripción de la prueba oral, pág. 837.
[220] *Véase*, Transcripción de la prueba oral, pág. 838.
[221] *Véase*, Transcripción de la prueba oral, pág. 839.
[222] *Véase*, Transcripción de la prueba oral, pág. 840.
[223] *Véase*, Transcripción de la prueba oral, pág. 842.
[224] *Véase*, Transcripción de la prueba oral, págs. 843 y 844.
[225] *Véase*, Transcripción de la prueba oral, pág. 845.
[226] Íd.
[227] *Véase*, Transcripción de la prueba oral, pág. 847.
[228] *Véase*, Transcripción de la prueba oral, pág. 849,
[229] *Véase*, Transcripción de la prueba oral, pág. 850.
[230] *Véase*, Transcripción de la prueba oral, pág. 852.
[231] *Véase*, Transcripción de la prueba oral, pág. 854.
[232] *Véase*, Transcripción de la prueba oral, pág. 857.

se usa para tabaco.[233] Había un mapo con aparentes manchas de sangre.[234] Añadió que al otro día comenzó a corroborar los videos, incluyendo el video de McDonald's y la gasolinera Samuel.[235] En el video de McDonald's se podía apreciar al señor Cornier Torres guiando y a una fémina de tez trigueña con espejuelos.[236] En el video de Walgreens se vio al señor Cornier Torres entrando con una camisa negra, un pantalón corto verde y unas botas marrón.[237] Salió de Walgreens a las 9:15 p.m.[238]

Expresó que también revisó los videos de la urbanización Quintas de Monserrate para corroborar la información que la pareja de la víctima le proveyó.[239] Sostuvo que el 17 de diciembre de 2018, este último no salió de la urbanización hasta las 5:53 p.m.[240] Verificó los videos de la farmacia Gabriela en Ponce que queda en la calle Cotto en la Avenida Roosevelt y la guagua Nissan Pathfinder pasó por esa área a las 12:37 p.m.[241] Asimismo, testificó que un minuto más tarde pasó una guagua marca Rav4 color verde y dobló a mano izquierda en dirección a la Avenida Roosevelt.[242] Expresó que según su investigación esa guagua pertenecía a la señora Bonet Torres y en ese momento la manejaba el señor Cornier Torres.[243] A las 12:52 p.m. pasó Almodóvar Ojeda en su guagua Nissan Pathfinder en dirección desde la villa, por cotto cana, dobla a su mano izquierda a la Avenida Roosevelt, hace un viraje y a las 12:52 p.m. sigue directo, en dirección a la casa del Apelante.[244] Expresó que según uno de los videos, a las 2:57 pm la guagua Pathfinder se paró en la calle Cotto y dobló hacia la residencia del señor Cornier Torres.[245] Según su investigación, el que estaba conduciendo la guagua en ese momento era el señor Cornier Torres e iba con la señora Bonet Torres.[246] También

---

[233] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 858.
[234] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 859.
[235] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 861.
[236] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 863.
[237] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 867.
[238] <u>Íd</u>.
[239] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 870.
[240] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 872.
[241] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 877.
[242] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 879.
[243] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 879.
[244] <u>Íd</u>.
[245] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 880.
[246] *Véase*, <u>Transcripción de la prueba oral</u>, pág. 881.

verificó el video de la Cooperativa de Adjuntas y observó una guagua Pathfinder pasar por esa área a las 7:00 p.m.[247] Respecto a los videos del Municipio de Adjuntas indicó lo siguiente:

> F. TORRES: Mire señor testigo, dígale al honorable eh, juez verdad, lo que usted pudo concluir, con relación al examen suyo, visual de esa traye, de esas, de esos videos de ese vehículo de motor en ese intervalo de tiempo.
> A. RODRIGUEZ: Si… eh, por el tiempo, este, cuando la guagua empieza, que empieza a bajar que coge y llega hasta Adjuntas, pasa, coge, este, pasa por el frente al cuartel, sigue asi derecho pasa la cooperativa, entra al pueblo, entra a la plaza, ahí esta la farmacia Jenny en la esquina. Pasa, la, la guagua dobla a la izquierda, dobla a la izquierda en la plaza y se mete a su mano derecha…
> F. TORRES: Mjm.
> A. RODRIGUEZ: …en dirección este, esa es la calle Rodolfo González, sigue hacia, sigue esa, esa ruta donde esta, la próxima entrada dobla a mano derecha que esta donde era eh, que ahora hay una funeraria Del Carmen….
> F. TORRES: Mjm.
> A. RODRIGUEZ:…perdóneme, la funeraria, de, de San Joaquín, dobla por ahí, eh, sigue la guagua y entra a la, a la 518.
> F. TORRES: ¿Cinco?
> A. RODRIQUEZ: 18
> F. TORRES: ¿Que esa es la carretera que llega a dónde?
> A. RODRIGUEZ: Esa, esa es la carretera donde llega, donde se encontró el cuerpo.[248]

El Agt. Rodríguez Cortez expresó que siguió investigando el área y en uno de los kilómetros más arriba donde se encontró el cuerpo, encontró un rótulo que decía "Manwe".[249] Como parte de su investigación, también descubrió que una ex pareja del señor Cornier Torres vivía cerca de donde se encontró el cuerpo de Almodóvar Ojeda.[250] El Agt. Rodríguez Cortez también verificó los videos de la pizzeria Campioni que está al lado del Rincón Argentino.[251] Surge del video que la señora Bonet Torres y el señor Cornier Torres llegaron a las 7:00 a.m. y él se fue a las 8:00 a.m. del lugar en la Rav4 color verde.[252] Expresó que entrevistó a la señora Bonet Torres en el Cuartel de Yauco.[253] Expresó que luego de estar en Adjuntas, el Apelante se dirigió a Juana Diaz y que según su investigación, se encontró con su madre.[254] Expresó que entrevistó a Carmen Asencio y que ella le

---

[247] Íd.
[248] *Véase*, Transcripción de la prueba oral, pág. 883.
[249] *Véase*, Transcripción de la prueba oral, pág. 886.
[250] Íd.
[251] *Véase*, Transcripción de la prueba oral, pág. 887.
[252] Íd.
[253] *Véase*, Transcripción de la prueba oral, pág. 895.
[254] *Véase*, Transcripción de la prueba oral, págs. 934 y 935.

dijo que el señor Cornier Torres y ella se prestaban dinero entre ellos y que ella le entregó al señor Cornier Torres una citación del Tribunal.[255] Expresó que entrevistó a uno de los amigos de Almodóvar Ojeda, conocido como Bobby, quien le comentó que se comunicó con una ex pareja del señor Cornier Torres y le preguntó donde vivía el Apelante, ya que el señor Antommattei Pasavento le había dicho que la había amenazado.[256] Bobby fue a la casa del señor Cornier Torres y se percató que la guagua de Almodóvar Ojeda estaba dentro de dicha residencia.[257] El Agt. Rodríguez Cortez declaró que entrevistó a más de 50 testigos en este caso y vio más de 20 videos.[258] Asimismo, manifestó que una vez terminó la investigación, llegó a la conclusión de que la persona que le ocasionó la muerte a Almodóvar Ojeda fue el señor Cornier Torres.[259]

Resumida la prueba testifical que tuvo ante sí el juzgador de los hechos, pasemos a evaluarla a luz del derecho aplicable.

Es norma constitucional conocida en nuestra jurisdicción que un acusado en un procedimiento criminal goza de una presunción de inocencia. Const. PR, Art. II, Sec. 11, 1 LPRA. Asimismo, nuestras Reglas de Procedimiento Criminal establecen que los acusados se presumirán inocentes, mientras no se pruebe lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. 34 LPRA Ap. II, R. 110. Así pues, es responsabilidad del Ministerio Público presentar evidencia y cumplir con el peso probatorio para demostrar, sin dejar lugar a dudas razonables, todos los elementos del delito, la intención criminal y la conexión de la persona acusada con los hechos. Pueblo v. Santiago *et al.*, *supra*, pág. 142. En consonancia con lo anterior, para establecer los elementos del delito de asesinato en primer grado, según fuera imputado al Apelante, se hacía necesario que se demostrara que el señor Cornier Torres le quitó la vida a la víctima a propósito. 33 LPRA sec. 5141 y 5142.

---

[255] *Véase*, Transcripción de la prueba oral, págs. 937 y 938.
[256] *Véase*, Transcripción de la prueba oral, pág. 953.
[257] *Véase*, Transcripción de la prueba oral, pág. 953.
[258] *Véase*, Transcripción de la prueba oral, pág. 964.
[259] Íd.

Es decir, que su objetivo consciente era darle muerte a esa persona. 33 LPRA sec. 5035.

Relacionado con lo anterior, nuestro ordenamiento jurídico permite la utilización de evidencia circunstancial para probar hechos en controversia. 32 LPRA Ap. VI, R. 110. La evidencia circunstancial es aquella que intenta demostrar un hecho en controversia utilizando pruebas de otros eventos, de los cuales, junto con otros hechos previamente establecidos, se puede deducir razonablemente el hecho en cuestión. Colón y otros v. K-mart y otros, *supra*, pág. 522. Este tipo de evidencia requiere un proceso de inferencias en conjunción con otra evidencia. Admor. F.S.E. v. Almacen Ramón Rosa, *supra*, pág. 719. Así, un hecho se establece como probado cuando se demuestra una conexión lógica entre la inferencia y el hecho previamente establecido. Chevere Mourino v. Levis Goldstein, *supra*, pág. 500. Cabe destacar que la evidencia circunstancial o indirecta tiene la misma validez que la prueba directa y es suficiente para sustentar un fallo de culpabilidad.

En cuanto a los testimonios de los coautores o cooperadores de delito, nuestras Reglas de Procedimiento Criminal disponen que éstos deben examinarse con desconfianza. 34 LPRA Ap. II, R. 156. No obstante, **esto no significa que no sean suficientes para sustentar una convicción, pues su único propósito es orientar al juzgador de los hechos respecto al valor que debe asignarles a los testimonios**. Pueblo v. Echevarría Rodríguez I, *supra*, pág. 317-318. Así pues, **si se determina que son fiables más allá de duda razonable, son adecuados para respaldar la condena de un acusado**. Íd. pág. 318.

Luego de evaluar el expediente ante nuestra consideración, con especial atención a la transcripción de la prueba oral de los testimonios vertidos en el juicio, estamos convencidos de que la prueba presentada por el Ministerio Público estableció, más allá de toda duda razonable, todos los elementos de los delitos imputados al Apelante, así como su intención criminal y su conexión con los hechos. Nótese, pues, que se estableció que el 17 de diciembre de 2018, a las 7:42 a.m., la joven Almodóvar Ojeda se

dirigió a la Universidad Católica de Mayagüez a tomar un examen de inglés. Como el examen fue suspendido, fue a casa de su amiga Génesis a las 10:23 p.m. a buscar el cargador de su celular. Luego llevó a su amiga al Hospital Metropolitano de San Germán para que visitara a un amigo. A las 11:32 a.m. llegó a la casa de sus padres para buscar comida. La joven Almodóvar Ojeda había quedado en encontrarse con el señor Cornier Torres en el hogar de este. A la 1:00 p.m. del mismo día, le escribió al Apelante que estaba cerca de su casa. Ese mensaje fue el último que ella envió. La prueba demostró que tampoco volvió a leer los mensajes de textos que le enviaron posterior a esa hora. A la 1:28 p.m., el localizador de la guagua Pathfinder que utilizaba Almodóvar Ojeda la ubicó en la casa del señor Cornier Torres.

Asimismo, el señor Pacheco Santiago y la señora Bonet Torres testificaron, bajo juramento, que el señor Cornier Torres les confesó haber asesinado a la joven Almodóvar Ojeda y a su vez, declararon cómo lo ayudaron a limpiar la escena y a disponer del cuerpo. Si bien es cierto que hubo algunas inconsistencias en sus testimonios, no es menos cierto que las contradicciones habidas son inconsecuentes. Éstas no constituyen base para alterar el fallo condenatorio. A nuestro juicio, no estamos ante cuadro en el que debemos sustituir el valor adjudicado al testimonios de ambos coautores que le dio el TPI y, por tanto, los entendemos como adecuadas sus versiones para respaldar la condena recaída en contra del señor Cornier Torres. Además de los testimonios, no podemos perder de perspectiva que el Ministerio Público presentó y se admitieron sobre novecientas (900) piezas de evidencia. Entre ellas, se encuentran más de 20 videos dónde se percibe al señor Cornier Torres conduciendo el vehículo de la señora Almodóvar Ojeda desde el Municipio de Ponce hasta el Municipio de Adjuntas. También se encontró sangre de la víctima en varios instrumentos encontrados en la casa del señor Cornier Torres.

De igual manera, la empuñadura del cuchillo considerado como el arma blanca utilizada para darle muerte a la joven Almodóvar Ojeda tenía perfil genético del señor Cornier Torres, según se desprendió de la prueba

pericial. Igualmente, se encontró evidencia sobre materiales utilizados en la disposición del cuerpo de la víctima consistente con los materiales encontrados en la escena del crimen. Por consiguiente, los testimonios y las novecientas (900) piezas de evidencia fueron suficientes para probar más allá de toda duda razonable todos los elementos del delito de asesinato en primer grado, la intención criminal del señor Cornier Torres y su vinculación con los sucesos del caso. La prueba de cargo demostró los hechos en controversia, de los cuales, junto con otra evidencia, se puede deducir razonablemente la comisión de los delitos en cuestión.

En fin, no hemos hallado indicador alguno que nos obligue a no concederle gran deferencia a las determinaciones de hechos realizadas por el juzgador de instancia, así como a las adjudicaciones de credibilidad que éste efectuó sobre los testigos que declararon ante sí. Pueblo v. Negrón Ramírez, *supra*, pág. 18. Fue el distinguido juzgador de hechos que tuvo la oportunidad de oír, ver y apreciar el comportamiento de los testigos. Íd., pág. 16. Tampoco surge del análisis de la prueba que hubiera mediado pasión, prejuicio o parcialidad o algún error manifiesto llevado a cabo por el TPI. Al examinar la prueba, notamos que la misma concuerda con la realidad fáctica de lo ocurrido el día de los hechos. Es decir, entendemos que, a la luz de la prueba admitida, no existe base suficiente que apoye la contención del señor Cornier Torres en su recurso, a los efectos de que el Ministerio Público no logró establecer su culpabilidad más allá de toda duda razonable. Más aún cuando el acto de aquilatar y apreciar la prueba está investido con "la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia". Pueblo v. Figueroa Rosa, *supra*, pág. 159 (1992).

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, *confirmamos* las *Sentencias* apeladas.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones